Michelle **HODGE**, Plaintiff–Appellant,

v.

**WAL–MART STORES, INCORPORATED**, Defendant–Appellee.

No. 03–1597.

United States Court of Appeals, Fourth Circuit.

March 10, 2004.

Argued: Jan. 22, 2004.

Decided: March 10, 2004.

**ARGUED:** James Broome Thorsen, Thorsen & Scher, L.L.P., Richmond, Virginia, for Appellant. Michael Scott Bucci, Morris & Morris, Richmond, Virginia, for Appellee.

Before WILKINSON, LUTTIG, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WILKINSON and Judge TRAXLER joined.

## OPINION

LUTTIG, Circuit Judge:

Appellant, Michelle Hodge, was injured by mirrors that fell from an upper shelf of a mirror display in a Richmond, Virginia, outlet of Wal–Mart Stores, Inc. ("Wal–Mart"). Hodge thereafter brought an action against Wal–Mart sounding in negligence. Hodge claimed that given the foreseeability of mirrors falling from shelves and injuring a customer in circumstances similar to those surrounding her accident, Wal–Mart had constructive notice that the mirror display constituted an unsafe condition. Additionally, Hodge claimed that Wal–Mart deliberately failed to question a customer who witnessed the incident about what happened, requiring the application of an adverse inference for spoliation of evidence. The district court granted summary judgment to Wal–Mart on the grounds that Hodge presented insufficient evidence under governing Virginia law to support her negligence claim, and that no spoliation inference was warranted. Finding no reversible error, we now affirm.

### I.

#### A.

The record evidence, viewed in the light most favorable to Hodge, shows the following. On July 17, 2001, Hodge went with her son, Jessie, to the Richmond Wal–Mart to purchase a mirror. Upon arriving at the aisle in which mirrors were displayed for sale around 6:00 p.m., she noticed that the mirrors were in a "state of disarray" and not arranged as they should have been; the area was "a mess." J.A. 33, 36, 41. Hodge noticed larger mirrors placed in front of smaller ones, and that the mirrors were not arranged by price or size. Some of the mirrors were located on an upper shelf as high as six feet off the ground and slanted against the back of the shelf, restrained only by a lip on the shelf one and a half inches high.

Shortly after arriving in the display area, Hodge was briefly distracted. When she turned her attention back to the display, she realized that she needed to move the mirrors around to examine them, so she bent over to place Jessie on the floor. As she stood up, she was struck by several mirrors that fell from the upper shelf, and suffered substantial injuries. A woman that Hodge had been talking to only a moment earlier ("the witness") exclaimed "oh my God, those mirrors just fell on that girl." J.A. 53. Hodge had not moved or touched the mirrors.

The first employee on the scene was assistant manager Many Bowman, who heard the glass shatter over Hodge and arrived while the witness was still present. Hodge testified that someone (probably Bowman) then directed another employee to "get some restraints to hold the mirrors back." S.J.A. 41. After some time passed, the witness asked Bowman if she could leave, but Bowman does not remember answering the witness' question. When Hodge noticed the witness leaving, Hodge told Bowman that the witness had seen everything, and urged her to get the witness' name, contact information, and ac-

count of the events. Although it was Wal–Mart's policy to request information about accidents from potential witnesses, Bowman declined and, pointing to the camera pod at the end of the aisle, stated that "[e]verything we need will be on that camera right there." S.J.A. 55. The witness then left.

Bowman eventually went to look for the witness after another Wal–Mart employee arrived at the accident scene. Bowman paged the witness over the intercom and searched the grocery area, but was unable to find her. Bowman later testified that she did not want to follow the witness immediately after the accident because she did not want to leave the area of the accident unsecured, and because she thought, incorrectly as it turned out, that the security cameras captured the events. The witness' identity was never discovered.

Wal–Mart was aware of the tendency for the mirror display in this store to become disorganized over the course of the day, most often through customers moving mirrors around while shopping. To address this problem, Wal–Mart had employees check the display periodically and rearrange the mirrors if required. One such employee was Jason Chalmers, who not only inspected and adjusted the mirrors at three separate times each day, but also as needed, as he passed by the display during the course of other duties. Chalmers provided uncontradicted testimony that he checked the mirrors around 3:30 p.m.—two-and-a-half hours before the accident—but that the display sometimes became disordered within an hour of his inspection.

#### B.

Hodge filed suit against Wal–Mart in federal district court, which had diversity jurisdiction over the case. Applying the negligence law of Virginia, the district court concluded that Hodge failed to establish the existence of an unsafe condition in the store because she could not provide any evidence as to why the mirrors fell and that, even if she could show that the display constituted an unsafe condition, she had produced no evidence that Wal–Mart could have foreseen the risk of danger. The district court also refused Hodge's request for an adverse inference for spoliation of evidence, reasoning that Hodge did not prove that Bowman's conduct regarding the witness was willful. Accordingly, the district court granted summary judgment to Wal–Mart and dismissed the case. *See Hodge v. Wal–Mart Stores, Inc.,* No. 3:02CV714 (E.D.Va. Apr. 18, 2003).

#### II.

On appeal, Hodge assigns error to the district court's conclusions as to the merits of her negligence claim and as to her request for a spoliation inference. Because a decision that an adverse inference based on spoliation was warranted would affect our analysis of the merits of Hodge's negligence claim, we address her spoliation claim first. Because the evidence does not show that Bowman willfully lost the witness' potential testimony, we conclude that the district court did not abuse its discretion in refusing to grant such an inference.

#### A.

The imposition of a sanction (*e.g.*, an adverse inference) for spoliation of evidence is an inherent power of federal courts—though one "limited to that [action] necessary to redress conduct 'which abuses the judicial process' "—and the decision to impose such a sanction is governed by federal law. *Silvestri v. General Motors Corp.,* 271 F.3d 583, 590 (4th Cir.

2001) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). Moreover, spoliation is not a substantive claim or defense but a "rule of evidence," and thus is "administered at the discretion of the trial court." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir.1995). Accordingly, even when reviewing the grant of summary judgment, the refusal to apply a spoliation inference must stand unless it was an abuse of the district court's "broad discretion" in this regard. *Cole v. Keller Indus., Inc.*, 132 F.3d 1044, 1046–47 (4th Cir.1998).

## B.

Hodge argues that the district court erred by refusing to apply an adverse inference based on Wal–Mart's alleged spoliation of relevant evidence. More specifically, Hodge claims that, given her own incapacity, Bowman's failure even to try to obtain the witness' account of the events or her identification and contact information (which could have allowed Hodge to obtain that account later) constituted a willful loss of evidence, requiring a spoliation inference in Hodge's favor.

 The spoliation of evidence rule allows the drawing of an adverse inference against a party whose intentional conduct causes not just the destruction of evidence, as Wal–Mart intimates, but also against one who fails to preserve or produce evidence—including the testimony of witnesses. *See Vodusek*, 71 F.3d at 155–56 (noting that failure to produce a witness "that naturally would have elucidated a fact at issue" may justify an adverse inference); *NLRB v. Ford Radio & Mica Corp.*, 258 F.2d 457, 463 (2d Cir.1958) (noting that when motivation of employer in taking certain action is at issue, "[the General Counsel's] refusal to elicit th[e] readily available and crucial testimony of a dis-interested witness may well be taken to mean that the information was adverse to his case."). But such an inference "cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." *Vodusek*, 71 F.3d at 156.

According to Hodge, the evidence in this case supports an inference that Bowman knew that it was likely that Wal–Mart would be exposed to legal liability from the accident, and that the witness could provide evidence that would adversely affect Wal–Mart's legal position, justifying an inference that Bowman's failure to try to obtain the witness' account was deliberate. Hodge claims that, in concluding that no spoliation inference was justified because of lack of proof that Bowman's conduct was willful, the trial court misconstrued *Vodusek*, the only authority it cited on this ground. In turn, she contends, the court confused willful conduct (which is sufficient to infer spoliation) with "bad faith"—which "suffices to permit [a spoliation] inference, [but] is not always necessary." *Id.* at 156. She claims that what is relevant under *Vodusek* is that Bowman deliberately chose not to obtain the necessary information from the witness, and not Bowman's potentially bad-faith *reasons* for so choosing (*e.g.*, to reduce the strength of Hodge's case).

While Hodge's recitation of the requisite level of intent is correct, the evidence does not support a claim that Bowman willfully *lost* the witness' contact information or potential testimony. *Vodusek* did hold that an adverse inference based on destruction or loss of evidence could be justified where, in examining a boat after an accident, plaintiff's experts "deliberate[ly]" (though not necessarily in bad faith) ren-

dered portions of the boat useless for examination by defendants. *Id.* at 155–57. Here, however, Bowman never *possessed* the witness' contact information or account, and since she could not have forced the witness to tell her anything, Bowman did not have control of that information.[1]

Properly construed then, Hodge's claim of spoliation is supported only by Bowman's failure to question the witness while the witness was present, her failure to respond to the witness' request to leave the scene, and, once Bowman realized the witness had left the accident scene, Bowman's decision to stay with Hodge instead of following the witness. In essence, Hodge would require the application of a spoliation inference based on Wal–Mart's supposedly deliberate failure to reasonably investigate the causes of an accident on store premises—a proposition for which Hodge cites no authority. While the evidence suggests that Bowman perhaps should have queried the witness about the accident before the witness left, there is no reasonable basis in the evidence to infer that Bowman acted in bad faith by, *e.g.,* intentionally deceiving Hodge or the witness about the security camera's capabilities when explaining why the witness did not need to stay. Accordingly, we cannot conclude that Bowman's actions constituted a willful loss of evidence resulting in an abuse of the judicial process, such as would warrant a finding of spoliation.

## III.

Having concluded that no sanction for spoliation was justified, we next address Hodge's claim that the district court erred in granting summary judgment against her on the merits of her negligence claim. We review this determination *de novo,* construing the evidence in the light most favorable to Hodge. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While we decline to rest on the district court's reasoning, we conclude that its decision to grant summary judgment was ultimately correct. Specifically, even assuming that the mirror display posed an unsafe condition that resulted in her injury, Hodge has neither evidence that Wal–Mart had actual notice of the condition nor evidence of when the condition arose, and thus cannot prove that the condition existed sufficiently long for a jury to conclude that Wal–Mart had constructive notice of it.

## A.

■■ The general rule in Virginia is that a plaintiff must, in order to establish a defendant's negligence, prove *"why* and *how* the incident happened"; "if the cause of the event is left to conjecture, guess, or random judgment, the plaintiff cannot recover." *Town of West Point v. Evans,* 224 Va. 625, 299 S.E.2d 349, 351 (1983) (emphasis added). To prove negligence in a premises liability case such as this, the plaintiff must first prove the existence of an unsafe or dangerous condition[2] on the

---

1. It is true that the duty to preserve material evidence imposes on a party an "obligation to give the opposing party notice of access to the evidence or of the possible [loss or] destruction of the evidence if the party anticipates litigation involving that evidence," even if the party "does not own or control that evidence." *Silvestri,* 271 F.3d at 591. But assuming Bowman can be said to have had access to the witness in some sense, that access was under sufficiently hurried condi-

tions and for a sufficiently brief time as to take it outside of the spoliation rule's ambit. And to the extent Bowman's failure to detain and *question the witness after the witness* asked to leave is a potential "loss" of evidence for these purposes, Hodge clearly had notice of the witness' impending departure.

2. As one might expect, Wal–Mart favors "dangerous" in its brief and appellant favors "unsafe," but at least for our purposes, the cases

premises. *Kendrick v. Vaz, Inc.,* 244 Va. 380, 421 S.E.2d 447, 450 (1992).

Applying these principles to reject Hodge's claim, the district court recited two of Hodge's theories for "why" the mirrors fell—either that a Wal–Mart employee (who the evidence shows only was nearby unloading a pallet) bumped the display or that a customer handled the mirrors and replaced them in a haphazard manner. But Hodge suggests additional theories as well, including that Wal–Mart was negligent in stacking the mirrors or in not providing restraints for them, that Wal–Mart did not check the mirror display frequently enough, and that Wal–Mart did not check the display after operating machinery (the pallet loader) in the area. Hodge, admittedly, has no evidence that any particular theory was "why" the mirrors fell. The district court concluded, and Wal–Mart contends on appeal, that without such evidence Hodge's negligence claim necessarily must fail.

■ However, a plaintiff who can show both that an unsafe condition existed on store premises and how that condition injured her is not precluded, under Virginia law, from reaching a jury on the issue of negligence simply because she lacks evidence as to *why* the unsafe condition resulted in her injury. Rather, the plaintiff's claim may survive summary judgment if the evidence would allow a reasonable jury to conclude that the premises' owner had actual or constructive notice of the unsafe condition that caused her injury—*i.e.,* that the condition posed a foreseeable risk of danger to invitees and the owner had actual or imputable knowledge of the condition and its danger—and the jury could conclude that the owner was negligent in addressing the unsafe condition. *See*

*O'Brien v. Everfast, Inc.,* 254 Va. 326, 491 S.E.2d 712, 714–15 (1997).

In *O'Brien,* the Supreme Court of Virginia held that a store could be held liable for the injuries of a plaintiff on which a bolt of fabric fell (*i.e.,* the *how* of her injury), even though the plaintiff could not prove *why* the bolt fell, because the "dangerous condition"—the bolt being leaned against a cutting table in violation of the store's safety policy—was known to a salesperson on the floor. *Id.* According to the *O'Brien* court, "[t]he absence of evidence as to what caused the bolt of fabric to fall would not preclude the jury from finding that O'Brien's injury resulted from [the store's] negligence" because "[t]hese facts were sufficient to permit the jury to find, without resorting to speculation or conjecture, that the salesperson knew of the potential danger" (*i.e.,* had notice of the unsafe condition) and "to determine whether the defendant was negligent in permitting the dangerous condition to exist." *Id.* (1997); *see also Holcombe v. Nations–Banc Fin. Servs. Corp.,* 248 Va. 445, 450 S.E.2d 158, 160 (1994) (holding that evidence was sufficient to go to jury on whether the danger posed by the allegedly unsafe condition—the manner in which certain partitions were stored—was foreseeable even absent proof of why the partitions fell on the plaintiff).

As an initial matter, it is not entirely clear from the evidence whether the mirror display was an unsafe condition at all. But in light of the disarray in which Hodge found the display area when she arrived, the unexplained fall of the mirrors, and other circumstantial evidence in the record, we will assume without deciding that Hodge's injury resulted from an unsafe

---

make no meaningful distinction between the two. *See, e.g., Fobbs v. Webb Bldg. Ltd. P'ship,* 232 Va. 227, 349 S.E.2d 355, 357

(1986) (concluding that there was sufficient evidence that a condition was "unsafe, dangerous or hazardous").

condition posed by the mirror display.[3] However, there is no evidence that Wal–Mart actually knew of the condition of the mirror display immediately preceding the accident, and thus Wal–Mart lacked *actual* notice of the unsafe condition that injured her. Therefore, Hodge must show Wal–Mart's *constructive* notice of the unsafe condition: *i.e.*, that "an ordinarily prudent person, given the facts and circumstances [Wal–Mart] knew or should have known, [would] have foreseen the risk of danger resulting from such circumstances...." *Memco Stores, Inc. v. Yeatman,* 232 Va. 50, 348 S.E.2d 228, 231 (1986).

### B.

As to the issue of Wal–Mart's constructive notice, the district court's primary support for its conclusion that Hodge failed to establish the foreseeability of the danger posed by any unsafe condition within the mirror display was the lack of evidence that Wal–Mart's display of the mirrors was in violation of store policy, which distinguished these facts from those of similar Virginia cases. *See, e.g., O'Brien,* 254 Va. 326, 491 S.E.2d 712, 714. While compliance with store policies (safety or otherwise) may be sufficient in some cases to resolve the question of the store owner's constructive notice of an unsafe condition, we do not think that this has the dispositive weight here that the district court's brief analysis might suggest. In other words, Wal–Mart's compliance with store policies (safety or otherwise) would not preclude constructive notice of the unsafe condition of the mirror display if other evidence suggests that the condition's danger was foreseeable.

That said, the evidence still would not allow a reasonable jury to conclude that Hodge carried her burden on this point. Despite Wal–Mart's admitted lack of actual notice of a specific unsafe condition, Hodge maintains that Wal–Mart had "actual and constructive notice of the risk of falling merchandise and of the recurrent disarray of the mirrors themselves." Br. of Appellant at 10–11. As evidence, Hodge points to, *inter alia,* the litany of incidents of falling merchandise that occur in Wal–Mart stores generally, *see id.* (quoting from *Doe v. Wal–Mart Stores, Inc.,* 210 W.Va. 664, 558 S.E.2d 663, 679–80 (2001), which discusses evidence that over 18,000 such incidents occurred during one five-year period), and the steps that Wal–Mart took (as well as the reasons for doing so) to monitor the mirror display in that store.

But such evidence is insufficient proof of actual or constructive notice under Virginia law; it goes only to whether the unsafe condition that produced her injury was foreseeable in general, not whether Wal–Mart had actual or constructive notice of the *specific* unsafe condition that injured her. Indeed, the Supreme Court of Virginia has squarely rejected the so-called "method theory," under which proof of actual or constructive notice of a specific dangerous condition can be omitted "if 'it is reasonably foreseeable that a dangerous condition is created by, or may arise from, the means used to exhibit commodities for sale.'" *Winn–Dixie Stores, Inc. v. Parker,* 240 Va. 180, 396 S.E.2d 649, 651 n. 3

---

**3.** The presence of some suggestion as to why the condition of the mirror display presented a danger helps to distinguish, in this respect, older cases such as *Williamsburg Shop, Inc. v. Weeks,* 201 Va. 244, 110 S.E.2d 189 (1959), where the plaintiff claimed, *inter alia,* that a slippery stairway or landing caused her to fall but "failed to produce any evidence, direct or circumstantial, that the stairway or landing where she fell was wet or slippery." *Fobbs,* 349 S.E.2d at 357 (summarizing and distinguishing *Williamsburg Shop,* 110 S.E.2d at 192).

(1990) (quoting *Thomason v. Great Atl. & Pac. Tea Co.*, 413 F.2d 51, 52 (4th Cir. 1969) and declining to "adopt the 'method-theory' embraced by [that] court"). Instead, the constructive notice inquiry under Virginia law focuses on whether knowledge of a *specific* unsafe condition may be imputed, which "may be shown by evidence that the defect was noticeable and had existed for a sufficient length of time to charge its possessor with notice of its [unsafe] condition." *Grim v. Rahe, Inc.*, 246 Va. 239, 434 S.E.2d 888, 890 (1993). "Hence, if the evidence fails to show *when* a defect occurred on the premises, the plaintiff has not made out a *prima facie* case [of negligence]." *Id.*

For example, in *Parker* the plaintiff slipped on a loose snap bean that had fallen to the floor from a sloping vegetable bin in the Winn–Dixie grocery store, but the plaintiff lacked evidence of how the bean ("the dangerous condition") got on the floor or whether an employee had missed the bean when mopping the area only minutes earlier. Rejecting the plaintiff's claim that evidence "about the concern of store employees for loose items show[ed] constructive notice on the part of Winn–Dixie," the court explained:

> There is no evidence in this case that Winn–Dixie knew of the presence of the bean on the floor, nor is there any showing of the length of time it may have been there. It is just as logical to assume that it was placed on the floor an instant before Parker struck it as it is to infer that it had been there long enough

that Winn–Dixie should, in the exercise of reasonable care, have known about it.

*Id.* at 651.

Here, Hodge's claim must fail for the same reason. Even assuming that she established that an unsafe condition existed in the display when she arrived, she failed to provide sufficient evidence of how much earlier the condition arose, and thus cannot establish that the condition was in existence for a time sufficiently long for a jury to conclude that Wal–Mart was negligent in addressing it. The record evidence suggests that the unsafe condition existed for less than two and one-half hours, the approximate time between Chalmers' last inspection and the accident. And while there is evidence that the display could become disordered as quickly as an hour after inspection, Hodge has insufficient evidence of when, that afternoon, the specific unsafe condition we have assumed produced her injury developed.[4] As was the case in *Parker*, it is as logical to assume that an unsafe condition with the mirrors arose in the moments before Hodge entered the display area as it is to assume that it had been there long enough that Wal–Mart should have known about it. *See also Grim*, 434 S.E.2d at 890 (holding that, where it was unclear for how long an alleged dangerous condition had existed, the jury was not allowed even to consider whether a one-day period would have been sufficient for constructive notice because "there is absolutely no evidence as

---

4. We cannot conclude, as Hodge also seems to suggest, that given the lack of bungee cords or similar restraints, the mirror display was unsafe even as arranged after Chalmers inspected it—in other words, that the display was inherently dangerous. For one, there is no record evidence of falling mirrors in this or any other Wal–Mart store under conditions similar to what Hodge observed upon arrival, much less when arranged as Wal–Mart desired. That the shelves from which the mirrors fell may have been as high as six feet from the ground could not, standing alone, support a conclusion that the display area was inherently dangerous. Rather, only through manipulation of the mirrors or shelves by, *e.g.*, customers, would the evidence seem possibly to support a conclusion that an unsafe condition had been created.

to when the [unsafe condition occurred], how it [occurred], no evidence that the owner knew about it. It could have [occurred] five minutes [before the injury] or sooner.").

## CONCLUSION

For these reasons, the judgment of the district court is affirmed.

*AFFIRMED*