**TENET HEALTHSYSTEM DESERT, INC., Plaintiff,**

v.

**FORTIS INSURANCE COMPANY, INC., and Does 1 through 25, inclusive, Defendant.**

**Case No. EDCV 06–598–VAP(SHx).**

United States District Court, C.D. California.

Aug. 30, 2007.

Carrie S. McLain, Ralph G. Helton, Rebecca A. Cucu, Helton Law Offices, Long Beach, CA, for Plaintiff.

Catherine V. Perry, Linda M. Lawson, Meserve Mumper and Hughes, Los Angeles, CA, for Defendant.

**ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND (2) DENYING PLAINTIFF'S MOTION TO AMEND**

VIRGINIA A. PHILLIPS, District Judge.

Defendant's Motion for Summary Judgment and Plaintiff's Motion to Amend came before this Court for hearing on August 27, 2007. After reviewing and considering all papers filed in support of, and in opposition to, the Motion, as well as the arguments advanced by counsel at the hearing, the Court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's Motion to Amend.

### I. BACKGROUND

On May 1, 2006, Plaintiff Tenet Healthsystem Desert, Inc. ("Plaintiff") filed a Complaint ("Compl.") in which it alleged claims for breach of implied contract, negligent misrepresentation, estoppel, and quantum meruit. [Compl. at ¶¶ 8–34.] Defendant Fortis Insurance Company ("Defendant") removed the action to this Court on June 13, 2007.

On August 6, 2007, Defendant filed a Motion for Summary Judgment ("Mot."), a Statement of Undisputed Facts ("SUF"), the Declaration of Brian R. Mazen ("Mazen Decl."), the Declaration of Renee Debroux ("Debroux Decl."), the Declaration of Mary Jo Randall ("Randall Decl."), and the Declaration of Gavin X. McLeod ("McLeod Decl."). On August 13, 2007, Plaintiff filed an Opposition ("Opp'n") and a Statement of Genuine Issues ("SGI"). On August 20, 2007, Defendant filed a Reply ("Reply"), the Supplemental Declaration of Mary Jo Randall ("Supp. Randall Decl."), and "Objections to, and Motion to Strike, Plaintiff's Evidence."[1] On August

21, 2007, Plaintiff filed the Declaration of James B. Hillsburg ("Hillsburg Decl."), the Declaration of Vicki Gandolfo ("Gandolfo Decl."), and the Declaration of Stephen Warford ("Warford Decl."). On August 26, 2007, Plaintiff filed the Supplemental Declaration of Vicki Gandolfo. ("Supp. Gandolfo Decl.").

On August 3, 2007, Plaintiff filed a Motion for Leave to Amend ("Mot. to Amend") and the Declaration of James B. Hillsburg ("Hillsburg Decl. 2"). On August 13, 2007, Defendant filed an Opposition ("Opp'n to Mot. to Amend") and the Declaration of Brian K. Mazen ("Mazen Decl. 2"). On August 20, 2007, Plaintiff filed a Reply ("Reply to Mot. to Amend") and the Supplemental Declaration of James B. Hillsburg ("Hillsburg Decl. 3").

### II. LEGAL STANDARD

#### A. Summary Judgment

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment. *Margolis v. Ryan,* 140 F.3d 850, 852 (9th Cir.1998); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.,* 707 F.2d 1030, 1033 (9th Cir.1983). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of mate-

---

1. The Court construes this document as objections to the evidence.

rial fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Where the moving party has the burden at trial, "that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Celotex,* 477 U.S. at 331, 106 S.Ct. 2548. The burden then shifts to the non-moving party "and requires that party . . . to produce evidentiary materials that demonstrate the existence of a 'genuine issue' for trial. . . ." *Id.; Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; Fed.R.Civ.P. 56(e).

A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. *Barlow v. Ground,* 943 F.2d 1132, 1135 (9th Cir. 1991); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987).

**B. Motion to Amend**

■ Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." The Ninth Circuit has held that " '[t]his policy is to be applied with extreme liberality.' " *Eminence Capital, L.L.C. v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting *Owens v. Kaiser Found.*

*Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir.2001)).

Leave to amend, however, is not automatic. The Ninth Circuit considers a motion for leave to amend under five factors: bad faith, undue delay, prejudice to the opposing party, the futility of amendment, and whether the plaintiff has previously amended his or her complaint. *Nunes v. Ashcroft,* 375 F.3d 805, 808 (9th Cir.2004). The Ninth Circuit has further held that "it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capital,* 316 F.3d at 1052.

**III. EVIDENTIARY OBJECTIONS**

**A. Declaration of Mary Jo Randall** [2]

The Court overrules the objections to the Declaration of Mary Jo Randall.

**B. Declaration of Gavin X. McLeod** [3]

The Court overrules the objections to Paragraphs 11, 13, and 14.

**C. Declaration of Renee Debroux** [4]

The Court sustains the objections to Paragraphs 17 and 18.

**D. Declaration of Vicki Gandolfo** [5]

■ The Declaration of Vicki Gandolfo contradicts Ms. Gandolfo's prior deposition testimony in an attempt to create a triable issue of material fact. A party may not "create [its] own issue of fact by an affidavit contradicting [its] prior deposition testimony." *Foster v. Arcata Assocs., Inc.,* 772 F.2d 1453, 1462 (9th Cir.1985). "[T]he

2. Ms. Randall is an insurance consultant Defendant retained as an expert witness in this matter. [Randall Decl. at ¶ 1.]

3. Mr. McLeod is a physician Defendant retained as an expert witness for this matter. [McLeod Decl. at ¶ 1.]

4. Ms. Debroux is Defendant's former intake representative supervisor. [Debroux Decl. at ¶ 1.]

5. Ms. Gandolfo is Plaintiff's Director of Patient Access and is responsible for preadmission insurance verification. [Gandolfo Decl. at ¶ 1.]

non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Messick v. Horizon Industries, Inc.*, 62 F.3d 1227, 1231 (9th Cir.1995) (stating that inconsistencies in a deposition and subsequent declaration that concern "peripheral details" do not preclude consideration of the declaration).

█ Here, Plaintiff attempts to create a triable issue of fact with her declaration that contradicts her prior deposition testimony. The declaration goes beyond elaborating on her prior testimony and raises more than minor inconsistencies. During her deposition, Ms. Gandolfo testified that information provided during October and December, 2002 telephone calls between Plaintiff and Defendant, including a reference number, amounted to a verification, not an authorization. [Mazen Decl., Exh. D at 133:16–134:18.] In her declaration, Ms. Gandolfo stated, that based upon her review of documents that Defendant produced in discovery prior to her deposition and that are from Defendant's internal computer systems, the reference numbers were "in fact pre-authorization reference numbers." [Gandolfo Decl. at ¶¶ 13, 14.] Not only were these documents available prior to the deposition but they are documents Plaintiff would not have had access to during the October and December, 2002 telephone calls.

Moreover, Ms. Gandolfo testified at her deposition that Defendant did not make false, misleading, or untrue statements. [Mazen Decl., Exh. D at 166:14–167:14,

201:2–202:3.] In her declaration she stated that Defendant made a false, misleading or untrue statement by identifying the "reference number to the Hospital's representatives as a pre-authorization number." [Gandolfo Decl. at ¶ 15.] While Ms. Gandolfo attempted to distinguish the statements by explaining that, after the deposition, she reviewed documents from Defendant's internal computer system that were produced in discovery, those documents had been produced before her deposition and would not have been available to Plaintiff as of the time of the October and December, 2002 telephone calls.

As a third example of this conflicting testimony, Ms. Gandolfo testified at her deposition that Defendant was not involved in arranging for Mr. Wyatt's treatment and that he chose to come to the Hospital. [Mazen Decl., Exh. D at 166:19–167:14.] In her declaration, however, Ms. Gandolfo stated that the pre-authorization of each of the two hospital admissions "constituted a request for treatment" by Defendant. [Gandolfo Decl. at ¶ 16.]

Plaintiff cannot avoid summary judgment, and fails to create a genuine issue of material fact, by contradicting Ms. Gandolfo's deposition testimony under oath with her later declaration. The inconsistencies go to the heart of the dispute, and are much more than "peripheral details." *Messick*, 62 F.3d at 1231. For these reasons, the Court declines to consider the Declaration of Vicki Gandolfo.[6]

**E. Declaration of Stephen Warford[7]**

The Court sustains the objection to Paragraph 3 at "The Agreement is ... December 20, 2002 and January 1, 2003."

---

**6.** The Supplemental Declaration of Vicki Gandolfo properly lays the foundation needed for the testimony in her declaration but does not resolve the inconsistencies between the deposition and the declaration.

**7.** Mr. Warford is Plaintiff's Director of Patient Financial Services and has knowledge of its contracts with insurance companies.

## IV. UNCONTROVERTED FACTS [8]

The following material facts have been adequately supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for the purposes of this Motion. *See* Local Rule 56–3.

### A. The Insurance Policy

Defendant insured Tom C. Wyatt ("Wyatt"), who was insured by Defendant under short term medical policy number 7851250 ("Policy"), with an effective date of October 1, 2002. [Mazen Decl., Exh. A, Exh. B.] The Policy does not cover pre-existing conditions, or a "Sickness or Injury" for which the insured received "medical advice, diagnosis, treatment or services" within the six month period prior to the Policy's effective date, within the first six months it is effective. [*Id.*, Exh. A.] Plaintiff seeks $370,758.04 for medical services it provided to Mr. Wyatt between October 19 and October 28, 2002 and between December 20, 2002 and January 1, 2003. [*Id.*, Exh. C at ¶¶ 5–6.]

### B. The October and December, 2002 Hospital Visits

On October 19, 2002, eighteen days after his Policy became effective, Mr. Wyatt went to Plaintiff's emergency room complaining of severe diarrhea and weight loss. [*Id.* ¶ 2, Exh. F; McLeod Decl. at ¶ 3.] Defendant did not request that Plaintiff provide medical services to Mr. Wyatt.

On October 21, 2002, Plaintiff telephoned Defendant to notify it that Mr. Wyatt had been admitted to the Hospital and to verify his insurance status. [*Id.* ¶ 11; Exh. D at 119:25–120:20, 122:5–9; & Exh. G.] Plaintiff's "Patient Account Information Collection Notes" for the October 21, 2002 call show that Defendant provided Plaintiff with reference Number 127476. [*Id.*, Exh. D at 120:3–20.]

On December 18, 2002, Plaintiff contacted Defendant and sought verification of coverage in relation to an admission that was to take place on December 20, 2002. [*Id.*, Exh. D at 172:8–175:18.]

On December 20, 2002, Mr. Wyatt was re-admitted to the Hospital with severe respiratory failure and other complications of AIDS. [*Id.*, Exh. M; McLeod Decl. at ¶ 10.] Plaintiff telephoned to notify Defendant the same day that Mr. Wyatt had been admitted. [Mazen Decl., Exh. L.]

Plaintiff's "Patient Account Information Collection Notes" for December 20, 2002 read, in part, "She took info and said we do not need to call back with clinical or discharge info. Claim only requires a notification of admit and to use her name for reference number purposes." [*Id.*, Exh. D at 178:14–179:19.]

Defendant provided a "pre-existing condition disclaimer" during the October and December calls, which commonly is given to Plaintiff by insurers. [Mazen Decl., Exh. D at 120:3–20, 126:2–127:8, 128:12–22, 175:19–176:16.] Plaintiff understood that Defendant might not pay the claim if it found the services were for a pre-existing condition, a determination that had not been made. [*Id.*, Exh. D at 126:22–127:8, 128:12–28, 130:4–132:15.] Plaintiff also understood the telephone calls did not constitute a guarantee of payment. [*Id.*, Exh. D at 141:19–24.]

Although a pre-authorization number was provided, Defendant gave other infor-

---

8. Many of Plaintiff's Proposed Additional Facts concern a claim Plaintiff has not pled, breach of a written agreement based upon the PHCS Preferred Hospital Agreement. As Plaintiff has not pled such a claim, facts related to this topic are not relevant to this Motion.

mation during the October and December, 2002 calls consistent with verification, not authorization. [*Id.*, Exh. D at 133:16–134:18, 140:1–141:8, 175:15–18, 177:1–21.] The description of the October and December, 2002 calls did refer to a "tracking number," but this type of tracking number is not an authorization. [*Id.*, Exh. D at 133:16–134:18, 140:23–141:8, 177:16–178:9.]

Plaintiff knew of no false, misleading, or untrue statements made by Defendant in connection with the calls or at any other time, and admits Defendant did not fail to provide it with any information. [*Id.*, Exh. D at 166:19–167:14, 201:9–202:3.]

Plaintiff would have treated Mr. Wyatt whether or not Defendant covered the treatment for the October and December, 2002 admissions, because those services were medically necessary and he presented himself to the Hospital for treatment. [*Id.*, Exh. D at 154:18–24, 167:25–169:1, 176:2–13, 180:20–181:5.]

After he was diagnosed as in the late stages of HIV infection, Mr. Wyatt was discharged from the Hospital on October 28, 2002. [*Id.* at ¶¶ 2, 10, Exhs. H, I.] Plaintiff claims that the total billed charges for the October admission amounted to $100,411.71 and the bill for the December admission came to $270,346.33. [*Id.*, at ¶ 5, Exh. J. at Resp. Inter. 4.]

Only Defendant's Customer Service Representatives and Intake Representatives, who cannot provide authorizations, spoke with Plaintiff in the October 21, 2002, December 18, 2002, and December 20, 2002 telephone calls. [Debroux Decl. at ¶¶ 4, 11, 12, 13.] No one from Defendant's Clinical Review Unit, the employees authorized to evaluate and issue a pre-authorization for services, spoke to Plaintiff during these calls. [*Id.* at ¶¶ 20–23.]

On January 1, 2003, 72 days after the October admission, Mr. Wyatt died at the Hospital as a result of complications from AIDS. [*Id.*, Exh. D at 81:20–22; McLeod Decl. at ¶ 10.]

Even if a pre-authorization of medical necessity or appropriateness had been given, it is not a guarantee of payment, and Plaintiff understood Defendant made no guarantee to pay benefits. [Mazen Decl., Exh. D at 141:19–24, 128:20–22, 130:4–131:5, 175:23–176:24, 189:18–190:17.] Defendant provided the sort of oral disclaimer that Plaintiff "always" receives during this process: that the treatments would not be covered if they were for the treatment of a condition that existed prior to the effective date of coverage. [*Id.*, Exh. D at 126:5–127:8. 128:20–22, 130:4–131:5, 175:23–176:24.]

## C. The May, 2002 Hospital Visit and A Pre–Existing Condition

According to Plaintiff's "Patient Information Facesheet," dated October 19, 2002, Mr. Wyatt's last admission to the Hospital occurred May 27, 2002, less than five months before the Policy's effective date. [Mazen Decl., Exh. N.] Plaintiff claims that the medical records for Mr. Wyatt's May 27, 2002 admission have been lost or misplaced. [*Id.* ¶¶ 4 & 6, Exhs. P & S.]

The claim forms for Mr. Wyatt's admissions to the Hospital on October 19, 2002 and December 20, 2002 show the Hospital provided treatment for the diagnosis codes of 528.9 and 523.4, the same ones applied to the May 27, 2002 hospital visit. [*Id.* at ¶¶ 3 & 12, Exhs. Q & R.] These diagnosis codes indicate unspecified disease of oral soft tissue (528.9) and periodontitis (523.4). [McLeod Decl. at ¶ 13.] HIV and AIDS patients are at increased risk of developing periodontitis, or infection of the gums, due to a weakened immune system. [*Id.*] AIDS patients also face higher risk of thrush, an oral fungus. [*Id.*]

Mr. Wyatt received three pharmaceutical products in the emergency room on May 27, 2002, so it is likely that thrush was present in addition to the periodontitis. [*Id.*] According to Dr. McLeod, a Defense expert, the presence of periodontitis and the likely presence of thrush are signs that Mr. Wyatt had AIDS or advanced HIV infection in May, 2002. [*Id.*]

Dr. McLeod added that Mr. Wyatt's medical records show that he suffered from advanced end stage AIDS when he presented to the Hospital on October 19, 2002 and that he must have had HIV infection for many years prior to October 2002. [*Id.* at ¶¶ 3, 7, 9, 11, 12.]

### D. Defendant's Practices in 2002

In 2002, Defendant had standard procedures for fielding telephone calls from insurers or healthcare providers seeking verification of an insured's eligibility for coverage, or seeking pre-authorization under a short-term medical policy. [Debroux Decl. at ¶¶ 2–17.]

In 2002, such calls typically were first received by a Short Term Customer Service Representative, who would verify an insured's eligibility for coverage, that the insured had an active policy. The Representative also would read from a written script and advise the caller of Defendant's disclaimer that the insured's policy and coverage were subject to a pre-existing condition. [*Id.* at ¶ 3.]

At no time in 2002, or any other time, did Defendant's Customer Service Representatives have the ability or authority to provide callers with a pre-authorization of medical services for an insured. All pre-authorizations of medical services were evaluated and made solely by Defendant's Clinical Review Unit. [*Id.* at ¶ 4.]

The Customer Service Representative transferred the call to a Short Term Intake Representative who obtained basic information from the caller. The Intake Representative gave the caller a "transaction number" as evidence that the caller had notified Defendant of the insured's medical services or admission to the hospital. The intake Representative advised the caller, by reading from a standard written script, that any potential benefits to be provided under the insured's policy were subject to the pre-existing condition exclusion contained in the insured's policy, and that the transaction number provided as evidence of notification did not guarantee the payment of benefits under the policy. [*Id.* at ¶ 5.]

In 2002, when an Intake Representative received a call from a healthcare provider less than seven days before services were to be performed, the Intake Representative always read a standard script to the caller. The script stated that the medical services under the policy were subject to a "Retrospective Review," and that a transaction number was evidence of notification but did not guarantee benefits. [*Id.* at ¶¶ 6, 7, 8; Mazen Decl., Exh. E.]

### E. Expert Testimony Regarding Industry Custom

As a routine part of the provision of medical care and potential insurance coverage in 2002, medical providers contacted the patient's health insurer at the time, or shortly before, a patient received medical services to verify the patient's policy was paid to date and active. This was typically called "verification" or "verification of eligibility." [Randall Decl. at ¶ 3.]

Pre-authorization, also called authorization, was the process in which the health insurer confirmed that the treatment requested was medically necessary and appropriate after it obtained information from the healthcare provider. In order to make a determination regarding pre-au-

thorization, the insurer needed to (1) examine the patient's history and medical records, and (2) obtain information about the type of pre-authorization requested. This process, by its very nature, could not be completed in a single telephone call. [*Id.* at ¶ 4.] Only after the process had been completed did the insurer provide a pre-authorization, through an authorization number and typically a follow-up letter. [*Id.* at ¶ 5.]

Conversely, emergency room admissions were treated differently. Insurers did not provide pre-authorization for these types of treatment. Instead, medical providers obtained verification of eligibility, [*Id.* at ¶ 6.] No reasonable medical provider would have interpreted either a verification or a pre-authorization as an agreement or guarantee to pay for the services rendered to the patient. [*Id.* at ¶¶ 7, 8.]

Even if Plaintiff believed that it received a pre-authorization or authorization during any of the three telephone calls, it reasonably could not have interpreted a pre-authorization or authorization to be an agreement or guarantee to pay for the services rendered to the insured. [*Id.* at ¶ 15.] While pre-authorization and verification of benefits were separate determinations, neither was an agreement to pay or a guarantee to pay for medical services provided to an insured. [*Id.* at ¶¶ 5, 7, 8, 15.] Defendant's expert witness, Ms. Randall, concluded that Defendant's conduct was consistent with the customs, standards, practices, and procedures within the healthcare and insurance industries. Defendant only provided a verification of eligibility to Plaintiff and Defendant did not agree or guarantee to pay Plaintiff for the

medical services rendered to Mr. Wyatt during either his October or December admission. [*Id.* at ¶ 16.]

## V. DISCUSSION

Defendant removed the case to this Court on the basis of diversity jurisdiction. 28 U.S.C. § 1332. The Court, therefore, applies California law to Plaintiff's claims, all of which are brought under California law. *Hayward v. Centennial Ins. Co.*, 430 F.3d 989, 991 (9th Cir.2005).

### A. Breach of Implied Contract

▇▇▇ An implied contract is "one, the existence and terms of which are manifested by conduct." Cal. Civ.Code § 1621. California law requires four elements to form a valid contract: 1) parties capable of contracting; 2) their mutual consent; 3) a lawful object; and 4) sufficient consideration. Cal. Civ.Code §§ 1550, 1565.

▇▇▇ Defendant argues the breach of implied contract claim fails because Defendant did not manifest intent to enter into a contract. [Mot. at 22–25.] Plaintiff asserts the parties intended to enter into a contract that was conditioned on Mr. Wyatt not having a pre-existing condition. [Opp'n at 22.]

The Complaint avers that the implied contract arose when Defendant verified that Mr. Wyatt was eligible for benefits and authorized treatment, and consists of an agreement by the parties that Plaintiff would care for and treat Mr. Wyatt until discharge, and Defendant would cover Plaintiff's expenses. [Compl. at ¶¶ 10–11.][9]

---

9. Plaintiff attempts to alter the theory of liability in its Opposition. It states, "Although Plaintiff's Complaint pleads that the authorization constituted the implied contract, it would also be reasonable for a jury to conclude that the implied contract came into being after treatment was completed and after TIC failed to object, which occurred subject to the pre-authorization." [Opp'n at 23.] Plaintiff, however, cannot raise a new theory of liability in opposition to summary judgment.

Other courts have rejected just such a theory. For example, in *Cedars Sinai Medical Center v. Mid–West Nat. Life Ins. Co.*, the court rejected a hospital's contention that "verification of coverage was a promise" to pay for a patient's "covered treatment, which resulted in a binding contract," holding that neither party manifested an intent to enter into a contract. 118 F.Supp.2d 1002, 1008 (C.D.Cal.2000).

■ Plaintiff has the burden at trial of proving all elements of its breach of contract claim; Defendant has met its burden on summary judgment by pointing to a failure of proof of a required element, mutual consent to enter into a contract. Ms. Gandolfo testified that information provided during October and December, 2002 telephone calls between Plaintiff and Defendant, including a reference number, amounted to a verification, not an authorization. [Mazen Decl., Exh. D at 133:16–134:18.] A verification "cannot be construed as a binding contractual agreement." *Cedars Sinai Med. Ctr.*, 118 F.Supp.2d at 1008.

Defendant also introduced evidence that only its Clinical Review Unit, which is staffed by nurses, can evaluate, determine and issue a pre-authorization but Plaintiff did not speak to a member of that unit. [Debroux Decl. at ¶¶ 4, 11–13, 20–23.] Furthermore, according to Defendant's expert, it is standard practice for a healthcare provider not to receive a pre-authorization for an emergency room visit and it is Defendant's standard practice that a pre-authorization request requires seven days advance notice. [Randall Decl. at ¶ 14; Debroux Decl. at ¶ 12.]

Plaintiff's evidence that Defendant referred to the reference number in its internal notes as "PreAuth Trans Number" fails to raise a genuine issue of material fact. [Hillsburg Decl., Exh. B at TIC 000051.] An employee for Defendant clarified that the number "indicates that a call was received" and that "preauth" is "internal lingo" for when a caller requests pre-authorization and is provided with a transaction number, showing Defendant received a telephone call. [Debroux Depo. at 27:7–29:17; 76:3–77:18; 90:6–91:5; 102:12–103:9.]

■ Plaintiff's alternate theory, that two sentences in its December 20, 2002 "Patient Account Information Collection Notes" constitute an authorization, also fails to create an issue of material fact.[10] Ms. Gandolfo agreed the telephone calls did not amount to a guarantee to pay for Mr. Wyatt's treatment. [*Id.*, Exh. D at 141:19–24, 175:15–18, 177:16–178:9.] These statements are consistent with the testimony that Defendant's Representatives were directed and trained to read from a script and provide information to callers that a claim could be submitted without medical information because Plaintiff would be contacted if the medical records were necessary. [Debroux Decl. at ¶¶ 24, 25.] The Customer Service and Intake Representatives with whom Plaintiff spoke lacked authority to issue a pre-authorization, and a pre-authorization request required seven days advance notice. [Debroux Decl. at ¶¶ 4, 11, 12, 13.]

According to expert testimony on industry custom, Plaintiff had no reasonable basis for the belief that the statement was an authorization. [Randall Decl. at ¶ 14.]

*Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir.2000).

10. The two sentences state, "She took info and said we do not need to call back with clinical or discharge info. Claim only re-quires a notification of admit and to use her name for reference number purposes." [Mazen Decl., Exh. D at 182:20–185:17, 186:10–188:5.]

Plaintiff has not met its resulting burden of showing a genuine dispute of material fact; there was no mutual consent to enter into an implied contract.

## B. Negligent Misrepresentation

■ Under California law, negligent misrepresentation has the following elements: "(1) The defendant must have made a representation as to a past or existing material fact, (2) which was untrue, (3) which, regardless of the defendant's actual belief, was made without any reasonable grounds for believing it was true, and (4) which was made with the intent to induce the plaintiff to rely upon it; (5) the plaintiff justifiably relied on the statement, and (6) plaintiff sustained damages." *Cedars Sinai Med. Ctr.*, 118 F.Supp.2d at 1010 (citing *Gagne v. Bertran*, 43 Cal.2d 481, 487–88, 275 P.2d 15 (1954); *Continental Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal.App.3d 388, 402, 264 Cal.Rptr. 779 (1989)).

■ Defendant argues the claim fails for two reasons. First, even if Defendant represented that it would pay the benefits, the representation concerns future conduct. Second, Plaintiff's witnesses admitted Defendant made no false, misleading or untrue representations. [Mot. at 25.] [11]

■ Defendant has met its initial burden on the negligent misrepresentation claim. First, Plaintiff's representative admitted she was unaware of any false, misleading, or untrue statement made by Defendant during either the October or December telephone calls or at any other time. [Mazen Decl., Exh. D at 166:19–167:14, 201:9–202:3.] Second, the alleged representation concerns future conduct, that Defendant would cover Mr. Wyatt's treatment, which cannot form the basis for a negligent misrepresentation claim. *Magpali v. Farmers Group, Inc.*, 48 Cal.App.4th 471, 481–82, 55 Cal. Rptr.2d 225 (1996). Third, to the extent Plaintiff argues that Defendant made an omission by failing to inform Plaintiff that its Customer Service and Intake Representatives could not pre-authorize treatment, there is no liability for negligent omissions. *Byrum v. Brand*, 219 Cal. App.3d 926, 941, 268 Cal.Rptr. 609 (1990). Fourth, assuming a representation had been made, Plaintiff must rely upon the representation justifiably, and Defendant introduced evidence regarding industry custom, including the difference between verification and pre-authorization and that pre-authorization does not occur before emergency room visits due to time constraints, [Randall Decl. at ¶¶ 3–7], that demonstrates that Plaintiff could not have relied justifiably upon the representation. Plaintiff did not introduce evidence to meet its resulting burden.

## C. Estoppel

■ The elements of estoppel are: "(1) a representation of material fact by defendant, (2) with knowledge, actual or virtual, of the true facts, (3) to a party actually or permissively ignorant of the truth, (4) with the intention, actual or virtual, that the other party act upon it, and (5) the other party was induced to act." *Cedars Sinai*

---

11. Plaintiff argues in the Opposition that the negligent misrepresentation is "that it could provide the Hospital with a pre-authorization for Mr. Wyatt's emergency room admission" when in fact it could not do so. [Opp'n at 26.] The Complaint, however, alleges a different theory for the claim, i.e., that Defendant authorized Plaintiff to provide care to Mr. Wyatt and that the authorization "was made with the intent" that Plaintiff rely upon it although Defendant knew it would not cover the care and treatment provided to Mr. Wyatt. [Compl. at ¶¶ 17–23.] Plaintiff cannot raise a new theory of liability in opposition to summary judgment. *Coleman*, 232 F.3d at 1292.

*Med. Ctr.*, 118 F.Supp.2d at 1012 (citing *San Diego Municipal Credit Union v. Smith*, 176 Cal.App.3d 919, 923, 222 Cal. Rptr. 467 (1986)).

██ Defendant argues the estoppel claim fails because it made no misrepresentations or omissions and Plaintiff cannot show it was induced to act by Defendant's actions. [Mot. at 26.] Plaintiff argues Defendant failed to disclose that it does not provide pre-authorizations. [Opp'n at 26.] The Complaint, however, alleges that Defendant represented it would cover Mr. Wyatt's treatment when it did not intend to do so. [Compl. at ¶¶ 25–30.] Plaintiff cannot raise a new theory in opposition to summary judgment. *Coleman*, 232 F.3d at 1292.

██ Here, Defendant met its initial burden by introducing evidence that it made no false, misleading, or untrue statement at any time. [Mazen Decl., Exh. D at 166:19–167:14, 201:9–202:3.] Even assuming Defendant made a representation, Plaintiff was not induced to act upon it because Plaintiff admitted it would have treated Mr. Wyatt regardless of whether Defendant authorized treatment because it was medically necessary to do so. [*Id.*, Exh. D at 154:18–24.] Assuming Defendant made a representation, based upon industry custom and practice, Plaintiff was not justified in relying upon it. [Randall Decl. at ¶¶ 3–7; *See Regents of the University of California v. Principal Financial Group*, 412 F.Supp.2d 1037, 1046 (N.D.Cal.2006). Plaintiff failed to meet its subsequent burden.

## D.  Quantum Meruit

██ The elements of a claim based on quantum meruit are: "(1) that the plaintiff performed certain services for the defendant, (2) their reasonable value, (3) that they were rendered at defendant's request, and (4) that they are unpaid." *Cedars*

*Sinai Med. Ctr.*, 118 F.Supp.2d at 1013 (citing *Haggerty v. Warner*, 115 Cal. App.2d 468, 475, 252 P.2d 373 (1953)).

██ Defendant argues the claim fails because Plaintiff did not treat Mr. Wyatt at Defendant's request and because Plaintiff reasonably could not have interpreted Defendant's actions as a request for treatment. [Mot. at 26–27.] Plaintiff asserts a genuine issue of material fact exists regarding whether Plaintiff provided services at Defendant's request. [Opp'n at 27.]

Defendant satisfied its burden by introducing evidence that Plaintiff did not treat Mr. Wyatt at Defendant's request. [Mazen Decl., Exh. D at 86:12–87:17, 167:22–169:1; Exh. F; McLeod Decl. at ¶ 3.] *See Cedars Sinai Med. Ctr.*, 118 F.Supp.2d at 1013. Furthermore, based upon industry custom, Defendant did not agree to cover Plaintiff's medical expenses. [Randall Decl. at ¶¶ 3–7, 15.] Plaintiff failed to meet its resulting burden.

## E.  Breach of Express Contract

██ Plaintiff's Opposition contends that summary judgment is inappropriate because Defendant breached a written contract with the Hospital based upon the PHCS Preferred Hospital Agreement. [Opp'n at 16–21.] Plaintiff, however, has not stated a claim for breach of written contract in the Complaint.

Plaintiff argues that Defendant is mistaken that "the allegations of the Complaint restrict the scope" of this action. [Opp'n at 18.] Plaintiff cites *Crull v. GEM Insurance Co.*, 58 F.3d 1386, 1391 (9th Cir.1995), for the proposition that, under the notice pleading standards of Federal Rule of Civil Procedure 8, "[a]s long as the other side receives fair notice of the nature of the claim, the complaint does not need to allege the legal theory on which recov-

ery is being sought." [Opp'n at 18.] In *Crull*, the Ninth Circuit held that after a district court determined ERISA preempted state law claims, the district court should have considered relief under ERISA because the "pleadings need not identify any particular legal theory under which recovery is sought." *Crull*, 58 F.3d at 1391. The Ninth Circuit stated that the notice pleading standards were satisfied because the complaint alleged a policy covered medical expenses and "demanded the coverage called for in the policy." *Id.*

Unlike the pleading in *Crull*, here, the Complaint does not allege that the PHCS Preferred Hospital Agreement governed the relations between the parties regarding insurance payment and does not demand payment as determined by the Agreement; it does not even mention the Agreement. [Compl. at ¶¶ 1–34.][12]

In *Coleman*, 232 F.3d at 1292, the Ninth Circuit held that, in an adverse employment action where the Complaint alleged disparate treatment but failed to allege disparate impact, the plaintiff could not rely on disparate impact following the close of discovery in opposition to summary judgment. The Ninth Circuit explained that allowing the plaintiff to proceed on a disparate impact theory after the discovery cut-off would prejudice the defendant as a complaint puts "the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Id.*

Similarly, here, Plaintiff seeks to add a new theory of liability after the discovery cut-off. Plaintiff's argument that Defendant was on notice of the claim because Plaintiff (1) before the litigation began, sent an arbitration demand to Defendant that involved the Agreement and (2) sought discovery on the Agreement fails

because if this were Plaintiff's theory from the outset of this action, it should have pled it. [Opp'n at 19–21.] Furthermore, contrary to Plaintiff's argument, [Opp'n at 20]; the Joint Report of the Parties does not explicitly mention the Agreement.

**F. Request to Re–Open Discovery**

■ In the Opposition, Plaintiff argues it was unable to obtain several types of discovery it sought and requests that the Court allow it to conduct additional discovery. Plaintiff, however, never brought a motion to compel discovery before the discovery cut-off date of July 16, 2007 and is precluded from raising the argument now, after the discovery cut-off date. Scheduling Order ¶ 1(a).

**G. The Lost Hospital Records Pertaining to Mr. Wyatt's May, 2007 Emergency Room Visit**

■ Plaintiff claims to have "misplaced" the medical records related to Mr. Wyatt's May, 2007 emergency room visit, records that are directly relevant to a determination whether Defendant had a pre-existing condition. Nevertheless, Plaintiff contends Defendant engaged in an unfair business practice under California Insurance Code Section 790.03(h)(16) by failing to pay the claim because Plaintiff provided Defendant all of the medical records in its possession. [Opp'n at 25.] Plaintiff's argument lacks merit. Plaintiff did not inform Defendant the records were lost until April, 2007, more than four years after Mr. Wyatt's death, and Plaintiff reasonably could not have expected Defendant to rule upon a pre-existing condition before that time. [Mazen Decl., Exh. P.]

---

**12.** The reference to an agreement in the Complaint refers to an alleged authorization by

Defendant to pay Mr. Wyatt's medical expenses. [Compl. at ¶ 11.]

■ Defendant raises a spoliation argument, that Plaintiff should face sanctions for losing the records it had a duty to preserve. [Mot. at 27–28.] Plaintiff's response that Defendant did not plead an affirmative defense for spoliation fails because Defendant did not need to do so. Under California law, spoliation by a party to an action is not a separate tort or claim and the parties are limited to evidentiary and discovery remedies. *Cedars–Sinai Med. Ctr. v. Superior Court,* 18 Cal.4th 1, 17–18, 74 Cal.Rptr.2d 248, 954 P.2d 511 (1998). *See also Hodge v. Wal–Mart Stores, Inc.,* 360 F.3d 446, 449–50 (stating that spoliation is not a claim or defense but a rule of evidence from which an adverse inference may be drawn). Furthermore, Defendant was unaware of the misplaced records at the time it answered the Complaint in June 2006, almost a year before Plaintiff informed it the records had been misplaced.

■ "A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993). This includes the power to draw an adverse inference from the destruction of relevant evidence and the power to shift the burden of proof to the party that destroyed the evidence. *Med. Lab. Mgmt. Consultants v. Am. Broad. Co., Inc.,* 306 F.3d 806, 824 (9th Cir.2002); *Akiona v. United States,* 938 F.2d 158, 160–61 (9th Cir.1991). The destruction of the evidence need not be in "bad faith" to warrant the imposition of sanctions. *Glover,* 6 F.3d at 1329.

The Court finds that drawing an adverse inference from the loss of the records, i.e., that the records from Mr. Wyatt's May, 2002 hospital visit are unfavorable to Plaintiff and, therefore, suggest Mr. Wyatt had a pre-existing condition during the October and December, 2002 medical treatment, is an appropriate sanction due to the prejudice their loss has caused Defendant in this action.

The Policy does not cover pre-existing conditions arising within the sixth months prior to October 1, 2002. [Mazen Decl., Exh. A.] The May, 2002 emergency room visit occurred less than five months before the Policy's effective date, within this six-month period. [*Id.,* Exh. N.] Applying the negative inference, the records from the May, 2002 treatment contained information suggesting Mr. Wyatt had a pre-existing condition in October and December, 2002, a conclusion supported by other evidence introduced by Defendant. For example, the use of the same diagnosis codes during the May, October, and December, 2002 Hospital visits suggests Mr. Wyatt received treatment for the same underlying condition, and these codes are for diseases for which HIV and AIDS patients are at high risk. [*Id.* at Exhs. Q, R; McLeod Decl. at ¶ 13.] In addition, Defendant's medical expert, Dr. McLeod, concluded that Mr. Wyatt likely had AIDS or advanced HIV in May, 2002. [McLeod Decl. at ¶¶ 3, 7, 9, 11, 12.] Defendant has satisfied its initial burden that Mr. Wyatt had a pre-existing condition triggering a Policy exclusion. Plaintiff, however, failed to introduce evidence to refute its resulting burden, instead arguing that Defendant failed to introduce evidence that Mr. Wyatt had a pre-existing condition. [Opp'n at 25.]

The Policy has an exclusion for a pre-existing condition and Plaintiff admitted Defendant provided a pre-existing condition disclaimer during the October and December, 2002 telephone calls. [Mazen Depo., Exh. D at 126:5–127:8, 128:20–22, 130:4–131:5, 175:23–176:24.] Lack of coverage under Defendant's policy for Mr.

Wyatt's treatment is an alternate basis for summary judgment.

## H. Motion to Amend

Plaintiff seeks to add a new claim to the Complaint for breach of express contract. [Mot. to Amend at 3.]

 Plaintiff's assertion that it received information "for the first time" on May 10, 2007 indicating that Defendant was a party to the Agreement, [*Id.* at 5.], and that the Motion is timely, fails. Plaintiff admitted that it was aware of the Agreement and the breach of express contract theory before the lawsuit was filed, when it attempted to enforce an extrajudicial mandatory arbitration agreement. [Opp'n at 19.]

Plaintiff's argument that Defendant would not be prejudiced as trial is "unlikely" to be delayed by amending the Complaint fails. Defendant, in fact, would be highly prejudiced by allowing Plaintiff to add a new claim less than two months before the October 23, 2007 trial date and more than a month after the July 16, 2007 discovery cut-off date, losing the benefit to conduct discovery or prepare a defense as to this claim.

If, in the alternative, the Court allowed the parties to conduct additional discovery on this claim, the trial date would be delayed and Defendant would incur significant expense in conducting additional discovery. Furthermore, this Court's Standing Order prohibits parties from bringing more than one motion for summary judgment so Defendant would lose the opportunity to seek summary judgment on the additional claim.

Due to the significant prejudice to Defendant, the untimeliness of the Motion, and the delay granting the Motion would cause, the Court denies Plaintiff's Motion to Amend.

## VI. CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Motion to Amend.

**IT IS SO ORDERED.**