Filed 5/3/16  Tenet Healthsystem Desert v. Eisenhower Med. Center CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TENET HEALTHSYSTEM DESERT, INC., | D069296 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. INC 1303739) |
| EISENHOWER MEDICAL CENTER, et al., | |
| Defendants and Respondents. | |

APPEAL from judgments of dismissal, Superior Court of Riverside County,

John G. Evans, Judge.  Affirmed in part and reversed in part.

Helton Law Group, Carrie S. McLain, Teddy T. Davis and Kim M. Worobec for

Plaintiff and Appellant.

Seyfarth Shaw, F. Scott Page and Kiran Aftab Seldon for Defendant and

Respondent Eisenhower Medical Center.

Kinsella Weitzman Iser Kump & Aldisert, Dale F. Kinsella, Alan R. Kossoff and

Nicholas C. Soltman for Defendant and Respondent Keenan & Associates.

Plaintiff and appellant Tenet Healthsystem Desert, Inc. (Hospital) brought this action for damages on fraud and other theories against defendants and respondents Eisenhower Medical Center (Eisenhower) and Keenan & Associates (Keenan), among others. Eisenhower sponsors a health plan ERISA trust (the Plan) to provide health care benefits for its employees and their family members. Hospital alleges it incurred damages by providing uncompensated medical services to a patient who was a member of Eisenhower's Plan but who was denied coverage by the Plan (Patient X). Hospital claims actionable misrepresentations were made by Eisenhower and its agents who provided administrative services for the Plan, Keenan and codefendants Blue Cross of California, doing business as Anthem Blue Cross (Blue Cross), and its two affiliated companies (together Anthem).[1]

The trial court sustained demurrers by Eisenhower and Keenan to Hospital's third amended complaint (TAC), in large part without leave to amend. Hospital appeals the resulting judgments of dismissal, having declined to attempt amendment on its sole remaining claim (of unfair or unlawful business practices against all defendants; Bus. & Prof. Code, § 17200 et seq., the Unfair Competition Law or UCL). Hospital contends that it sufficiently pled not only its theories of fraud against Eisenhower, but also related

---

[1]    The Blue Cross defendants are Blue Cross of California, doing business as Anthem Blue Cross (Blue Cross), Anthem Blue Cross Life and Health Insurance Company (BC Life), and Anthem UM Services, Inc. (Anthem UM). At times, we will refer to them together with Eisenhower and Keenan as Defendants. Hospital separately appealed dismissal judgments obtained after demurrer by the Blue Cross defendants, and this court reversed those judgments in a published opinion, *Tenet Healthsystem Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821. We do not discuss Blue Cross issues here, only those pertaining to Eisenhower and Keenan.

2

contract based and equitable counts against it, all of which sought damages for the recovery of the treatment costs for Patient X, which the Plan eventually refused to pay by invoking an exclusion from coverage for treatment of any injuries incurred through a member's drunk driving (as was the case for Patient X). As against Keenan, negligent misrepresentation is alleged, along with the remaining UCL derivative cause of action against all Defendants.

Hospital contends that at all the relevant times, while Anthem performed its utilization management duties on behalf of its principal Eisenhower and Eisenhower's Plan administrator Keenan, the Defendants were on notice but failed to disclose facts indicating that Patient X's Hospital admission, when he had a blood alcohol level far exceeding the legal limit, would adversely implicate his ability to obtain coverage for his injuries.[2] Hospital pleads that the utilization management communications sent to it by Anthem representatives amounted to a set of misleading representations, which resulted in the authorization of approximately 50 days of services for Patient X as medically necessary. Collectively, Defendants allegedly failed to notify Hospital that his injuries fell under an exclusion in the terms of the Plan's coverage, until it was too late to seek other avenues of reimbursement or alternative places of treatment for him. Hospital

---

[2]     As will be more fully explained, Anthem UM was retained to perform utilization management duties for Eisenhower's ERISA Plan, and communicated with Hospital representatives with respect to Patient X's care on certifications of medical necessity and authorizations for services. (Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.) Generally, utilization review is the process of evaluating under a given health care plan whether health care services are medically necessary and consistent with acceptable treatment patterns. (*Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1599.)

alleges that either on their own behalf or as agents of one another, Defendants allegedly intentionally or negligently failed to make truthful representations about facts known to them about the probable applicability of the Plan's exclusion that disqualified Patient X from coverage, and Hospital justifiably relied on the representations, sustaining damages of the cost of treatment, approximately $1,996,265.50.[3]

In ruling on all the causes of action except the UCL claim, the trial court determined that the TAC lacked the necessary specificity to survive a demurrer or was otherwise defective. Although the order permitted Hospital to pursue amendment of the UCL theory, Hospital has decided to stand on its pleading and appeal the dismissals of Eisenhower and Keenan.

Our review of the TAC leads us to conclude that the trial court erred in sustaining Eisenhower's demurrers without leave to amend, as to each set of the three fraud based causes of action (Nos. 1-3 [rehab.]; 10-12 [ICU]) and that the UCL claim (No. 19) likewise survives. Keenan is charged only with negligent misrepresentation and UCL violations, and for the same reasons to be explained, we reverse the dismissal judgments as to Keenan (regarding causes of action Nos. 1, 10, and 19). Additionally, the separate claims against Eisenhower alone on certain contract and equitable theories (Nos. 4 and 13 [fraudulent promise made without intent to perform]), and estoppel (Nos. 6, 7, 15, 16),

---

3    Due to the sequence of treatment rendered for the injuries sustained by Patient X, the TAC frames its claims in two sets of causes of action, numbers 1 through 9 regarding the provision of rehabilitation (sometimes rehab.) services to him (costing $132,325.02), and numbers 10 through 18, regarding his initial intensive care unit services (ICU) (costing over $1.8 million).

and quantum meruit and common count (Nos. 8, 9, 17, 18) state sufficient facts supporting those claims. However, we agree with the trial court that the two causes of action for breach of an implied-in-fact contract against Eisenhower alone (Nos. 5, 14) fail to state sufficient facts to support their causes of action, and do not plead any agency theory, and we affirm the judgment of dismissal in that respect alone. The balance of the orders and judgments of dismissal are reversed in part, with directions to the trial court to overrule the demurrers and allow reinstatement of the TAC and any appropriate further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Injury, Hospital Admission and Rehabilitation Care*

As alleged in the TAC, Patient X was injured in a truck accident and hospitalized by May 7, 2012. When he arrived at Hospital by ambulance, it was discovered he was carrying a member identification card which listed a telephone number to call for "Pre-Authorization." The card identified Patient X as having health care coverage through a plan sponsored by Eisenhower. Patient X's "member identification card identified BC Life and Keenan as Eisenhower's authorized agent[s] and administrator[s] of Eisenhower's plan," and "further identified Blue Cross as Eisenhower's and BC Life's authorized agent and administrator who administers claims under Eisenhower's plan on behalf of BC Life."

At the emergency room, treatment was rendered and blood tests were taken. An admissions representative of Hospital called the "Pre-Authorization" number, (800) 274-7767, which Hospital was informed and believes is answered "by individuals who are the

5

agents of Eisenhower and the employees and agents of [Anthem and] Keenan."

"Aileen A." (Aileen) answered, and Hospital conveyed to her that Patient X had been admitted to the acute care hospital within Hospital for "post-stabilization services." Aileen gave the Hospital admissions assistant "reference number 0225239133 and requested that the Hospital fax a clinical review of the Patient's medical condition to (888) 391-3134." On behalf of Defendants, Aileen accessed certain private information about Patient X, such as his name and date of birth, that she and they "would not have had if they were not . . . agents [of Eisenhower]."

Hospital alleges it is informed and believes that the reply fax number given out by Aileen, on behalf of Anthem and Keenan ((888) 391-3134), is used by them "to communicate with providers regarding information necessary to authorize care and make coverage determinations on behalf of Eisenhower." Hospital's case manager faxed to the number Aileen had provided "a clinical review of the Patient's medical condition as of the date of service May 7, 2012." The clinical summary included information that Patient X had been brought to the emergency room by ambulance after having been in a motor vehicle accident in which he was an unrestrained driver, and that he had "tested positive for cannabis and a blood alcohol level ('ETOH' for ethyl alcohol) of .235."

The next day, Hospital representatives attempted to verify Patient X's benefit summary through a website "maintained jointly by [Anthem] and Keenan, on behalf of Eisenhower." The website did not disclose the existence of an exclusion from coverage for services to treat injuries sustained as a result of a participant's drunk driving. Hospital alleges that its practice is to reasonably rely on the information provided by a health care

6

plan and its representatives during the insurance verification and authorization process, because it cannot keep track of information regarding all exclusions from coverage applicable to the thousands of insurance plans that cover its patients.

On May 8, Hospital received a letter via fax from Anthem's case manager that "authorized" Hospital to admit Patient X and to provide medical services to him "at the ICU level of care." The letter identified the case manager as an employee of Anthem, showed that the fax was sent on Anthem's behalf, and included private information about the patient that an individual would not have possessed if he or she were not an agent of Anthem. The letter did not advise Hospital that Patient X's plan excluded coverage for services provided to treat injuries sustained when a plan participant was driving with a blood alcohol level over the legal limit, nor did the case manager inform Hospital of this fact over the telephone.

Over the next few days and weeks, Anthem repeatedly requested clinical information pertaining to Patient X. When Hospital provided the information, Anthem's "unnamed care managers" responded with telephone calls and faxed letters authorizing extensions of the approved care. These letters are on Anthem UM letterhead and reference Defendants' trademarks, and will be referred to here as the "medical necessity certification letters."[4]

---

[4]   In a separate order, we denied a request by Eisenhower, joined by Keenan, that this court take judicial notice of the medical necessity certification letters. They are described in but not attached as exhibits to any of the versions of the complaint. For California plans, Health and Safety Code section 1367.01, subdivisions (d) through (f)

On May 15, Patient X's case was referred to a "discharge planner" for Anthem, Nell Steele-Alvarez, for the purpose of making arrangements to send Patient X to a rehabilitation facility once he was discharged from the acute care hospital. Steele-Alvarez reviewed the clinical information sent to her about Patient X, which included information that his injuries had resulted from a vehicle accident that occurred while he was driving with a blood alcohol level in excess of the legal limit. On May 17, Steele-Alvarez informed Hospital case manager Janet Sobleskie that she was "investigating acute rehab facilities where the Patient would go when the Patient was discharged from Hospital's acute care hospital."

On May 16, Hospital documented that "it was not reviewing the Patient's account for potential alternative health care coverage because the existence of Patient's insurance coverage had been confirmed." Hospital received additional faxed medical necessity certification letters from representatives of Anthem, including Gabriela Becerra, on May 16, May 18, May 25, May 30, May 31, June 4, June 6 and June 11, "authorizing" medical care for Patient X in the ICU. They did not make reference to any applicable exclusions. The TAC alleges the dates and times of many of these contacts between Hospital's representatives and named and unnamed representatives of Anthem.

In further discharge planning between May 17 and June 15, Anthem's Steele-Alvarez telephoned Hospital's case manager Sobleskie and Hospital's rehabilitation case manager Robyn Angeli to discuss the plan for Patient X's rehabilitation care after his

_____

require that medical necessity determinations be made by health care professionals who are familiar with clinical principles and processes.

discharge from the ICU. Steele-Alvarez discussed Patient X's medical condition, clinical information, and discharge planning. On June 12, Steele-Alvarez called Hospital's nurse case manager regarding facilities where Patient X could be sent pursuant to the terms of his coverage following his discharge from the ICU, considering Patient X's medical condition, the basis for his admission, the nature of his injuries, and discharge plans.

On June 18, 2012, Hospital discharged Patient X from the acute care hospital, and, based on the requests by Steele-Alvarez that Patient X be treated at Hospital's acute rehabilitation facility, transferred and admitted Patient X as an inpatient at its acute rehabilitation hospital. On June 20, an unnamed care manager for Anthem sent Hospital a medical necessity certification letter on Anthem letterhead, authorizing the provision of acute rehabilitation services to Patient X through June 25. That same date, Anthem's Dionne Myers spoke with a representative of Hospital and verbally indicated that Hospital's provision of acute rehabilitation services to Patient X was authorized under the terms of his plan until June 25, when he was discharged.

When Hospital submitted claims to Defendants for reimbursement of its expenses, Hospital was notified on October 24, 2012 about the existence of the exclusion for coverage in Patient X's plan for "injuries sustained while drinking and driving." As a result, Hospital was denied payment for approximately 50 days of services that Hospital rendered to Patient X in its ICU and acute rehabilitation facility. Hospital alleges that since it was not informed of the coverage exclusion until late October 2012, it was unable to seek reimbursement via Medi-Cal because claims for Medi-Cal must be submitted within 60 days from the date the services were rendered.

9

## B. Pleadings; Agency

Hospital's complaint was originally filed in June 2013 against Anthem, Eisenhower, and Keenan, and was amended several times after demurrer hearings, at which the trial court required additional specificity for pleading of fraud as well as the other causes of action.[5] The 276-page TAC makes introductory, general agency allegations, that each Defendant acted for and within the scope of its agreed agency. It laboriously outlines specific agency allegations as to various individuals identified during Hospital's weeks of interactions with individuals who held themselves out as representing Anthem, for purposes of reviewing and authorizing the medical care being provided to Patient X. These allegations include dates, times, the manner of communication (e.g., the medical necessity certification letters, faxes and telephone calls), and give the telephone and fax numbers utilized, the names of individuals and their titles, if known, and the companies these individuals represented, as efforts to set forth factual bases for Hospital's belief that an agency relationship existed between the Defendants sufficient to bind them to the statements or misrepresentations made by each.

For example, Hospital asserts that when the person responding to inquiries at the phone number on the medical identification card (Aileen) requested, and the named Anthem employees (Steele-Alvarez, Myers, and the unnamed care managers) discussed the clinical condition of Patient X with Hospital representatives, all to enable continuing

---

5    In the discussion portion of this opinion, we will set forth additional details about the specific types of fraud allegations against Eisenhower and Keenan within the TAC, as well as the contract related and equitable claims against Eisenhower.

authorizations for ICU and rehabilitation services to be made, they were acting as agents and employees of each Defendant. Next, the joint maintenance of the website by Keenan and Anthem was done pursuant to the agency granted them by Eisenhower. The same groups of allegations about representations made by Aileen, Steele-Alvarez, Myers, and the unnamed care managers are repeated in subsequent fraud related and contract related causes of action, regarding agency of the named persons for Defendants.

The TAC alleges that the administrative services performed by Anthem and Keenan, on behalf of Eisenhower's Plan, included "all communications and direct dealings with providers, such as the Hospital, including but not limited to *verification of eligibility, benefits and authorization of services*; negotiating with providers, such as the Hospital, concerning any matters including the entering into and/or revisions to contracts; pricing claims in accordance with the terms of the plan documents and Summary Plan Description; producing member identification cards; conducting utilization review; *processing authorizations of services* and responding to providers' request for such authorizations; and coordination and management of medical care through case management." (Italics added; see pt. II.A, *post,* for explanation of related "trade custom and usage" allegations in support of agency theory.)

Although Hospital alleges that Eisenhower and Keenan, as well as Anthem, "had actual knowledge of the terms of the Plan's coverage, including exclusions," Hospital pleads that it "does not and could not possibly maintain information regarding all exclusions from coverage for the tens (if not hundreds) of thousands of health insurance plans that cover the patients the Hospital treats each year . . . ." Hospital thus alleges that

11

Defendants' agents made misrepresentations in the performance of their administrative services, for which they and Eisenhower should each be responsible, in the form of reimbursement of the costs of treatment of Patient X.

The TAC also brings numerous causes of action against Eisenhower alone, such as claiming it made promises without intent to perform (4th, 13th causes of action). (Civ. Code,[6] § 1572 [actual fraud requires proof of a party's intentionally deceptive acts, done as inducement to enter into a contract, including "(4) A promise made without any intention of performing it"].) Hospital alleges against Eisenhower that it entered into an implied-in-fact contract for Hospital's services supplied to its member, Patient X. Hospital further argues it is entitled to recover its expenses under theories of quantum meruit, common counts, promissory estoppel, or equitable estoppel (causes of action Nos. 5-9, 14-18).

### D. Demurrers and Rulings

In addition to bringing its own set of demurrers to the causes of action brought solely against it (Nos. 4-9, 13-18), Eisenhower joined in the demurrers and points and authorities filed by Anthem, regarding the fraud, concealment, negligent misrepresentation and UCL claims brought against all defendants, as well as the judicial notice request (Nos. 1-3, 10-12, 19). Keenan likewise joined in Anthem's demurring papers and request.

---

[6] All further statutory references are to the Civil Code unless noted.

12

In its rulings, the trial court declined to take judicial notice, requested by Eisenhower and Keenan, of the numerous medical necessity certification letters that Anthem had issued for treatment of Patient X. The court ruled that the contents of the letters were not proper subjects of judicial notice and would not be considered by the court. On the merits, the court stated that Hospital had failed to plead fraud and misrepresentation with the requisite specificity, because the TAC did not set forth "a single actual specific misrepresentation that was made by a specific defendant that the patient was covered."

With respect to the claims solely against Eisenhower, the court relied on its previous reasoning, in which it noted that as with fraud, the lack of specifically attributed statements was fatal to an allegation that some kind of implied contract had been established for a promise to pay, and likewise, the allegations of promissory or equitable estoppel or common counts failed.

The orders permitted Hospital to pursue amendment of its UCL theory, but judgments of dismissal were otherwise entered. Hospital brings this appeal as to Eisenhower and Keenan, seeking to overturn the orders and also to allow reinstatement of the UCL claim.

I

*APPLICABLE LEGAL PRINCIPLES*

A. Rules of Review

In demurrer analysis, this court assumes the truth of the properly pleaded factual allegations and of the facts that reasonably can be inferred from those expressly pleaded.

13

(*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 111 (*Fremont Indemnity Co.*); *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) We independently review the ruling on a demurrer to determine de novo whether the complaint alleges facts sufficient to state a cause of action. (*Fremont Indemnity Co.*, *supra*, at p. 111.) "We construe the pleading in a reasonable manner and read the allegations in context. [Citation.] We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons." (*Ibid.*)

Where leave to amend a pleading was denied, we apply an abuse of discretion standard and decide whether there is a reasonable possibility that the defect can be cured by amendment. "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan, supra,* 39 Cal.3d 311, 318.)

### B. Specificity Concerns for Fraud Claims

Hospital's assertions of misrepresentations form the basis of all the fraud and UCL allegations, and also underlie the contract based and equitable claims brought only against Eisenhower. The basic elements of fraud, giving rise to a tort action for deceit, are (1) a misrepresentation, which may take the form of a false representation, concealment, or nondisclosure; (2) knowledge of falsity; (3) intent to defraud and induce reliance; (4) justifiable reliance and (5) resulting damage (causation). (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (*Lazar*); §§ 1709, 1710.) "Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow defendant to understand fully the nature of the charge made." (*Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976)

14

57 Cal.App.3d 104, 109; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216-217 (*Committee on Children's Television*); *Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 157 (*Tarmann*).)

In the context of a fraud pleading, "general and conclusory allegations do not suffice. [Citations.] 'Thus " 'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect." ' [Citation.] [¶] This particularity requirement necessitates pleading facts which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Lazar, supra,* 12 Cal.4th 631, 645.) A plaintiff is held to a higher standard in asserting a fraud claim against a corporate defendant. "In such a case, the plaintiff must 'allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.' " (*Ibid.*)

"The specificity requirement serves two purposes. The first is notice to the defendant, to 'furnish the defendant with certain definite charges which can be intelligently met.' [Citations.] The pleading of fraud, however, is also the last remaining habitat of the common law notion that a complaint should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings. Thus the pleading should be sufficient ' "to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." ' " (*Committee On Children's Television, supra,* 35 Cal.3d 197, 216-217.) "[C]ertain exceptions [will] mitigate the rigor of the rule requiring specific pleading of fraud." (*Id.*

15

at p. 217.)  For example, less specificity is required of a complaint when " 'it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy,' [citation]; '[even] under the strict rules of common law pleading, one of the canons was that less particularity is required when the facts lie more in the knowledge of the opposite party . . . .' "  (*Ibid.*, *Tarmann*, *supra*, 2 Cal.App.4th 153, 157-159.)

II

*INTENTIONAL FRAUD (EISENHOWER, CAUSES OF ACTION*
*NO. 3 (REHAB.) AND NO. 12 (ICU)*

A.  Introduction to Issues and Agency Allegations

Because Hospital's claims arise in the transactional context of administration of a network agreement for provision and compensation of health care services, we examine the respective legal positions of the parties.  The agency allegations of the TAC are common to all the fraud-based claims.  For purposes of analysis of the issues concerning Eisenhower and Keenan, we note that the TAC specifies that each played different roles, as did the Anthem entities.

Eisenhower is alleged to be the principal or operator of the Plan.  Together with Keenan, Eisenhower created, but Eisenhower controlled, the terms of coverage and exclusions under its Plan.  It should be emphasized that this is not an insurance coverage case.  Eisenhower is not being charged as an insurer, and Hospital is not a plan participant or beneficiary, nor is it an assignee of one.  (Croskey, et al, Cal. Practice Guide:  Insurance Litigation (The Rutter Group 2015) ch. 6F-D, ¶ 6:1670, pp. 6F-50,

16

¶¶ 6:1698-1699, p. 6F-56 [plan beneficiaries have only the rights and remedies allowed under ERISA, such as seeking to recover benefits]; 29 U.S.C. § 1132(a)(1)(B).)[7]

Also, Eisenhower's respondent's brief represents that it had no direct contact with Hospital, since it delegated those duties to Anthem and to some extent Keenan, and therefore Eisenhower argues it, as the plan sponsor, has no "independent, continuing duty to disclose all possible exclusions throughout a utilization review process in which it does not itself participate." (Compare *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 [employer that negotiates group benefits for its employees undertakes a narrow agency capacity for those employees during such negotiations, but such agency does not preclude the employer from acting in its own interests to obtain cost savings when choosing a group plan]; Cal. Practice Guide: Insurance Litigation, *supra*, ch. 6F-B, ¶¶ 6:1330-1332, pp. 6F-3 to 6F-4.)

In the fraud claims, Eisenhower is being sued as a principal who should be responsible for damages from the misrepresentations, negligent or intentional, of its agents, Keenan and Anthem, who were administering the plan for it. (Cf. *Mintz v. Blue Cross of California*, *supra*, 172 Cal.App.4th 1594, 1598, 1611 [a health plan's third-party administrator may owe plan members a duty of due care in administering the plan to protect them from *physical injury* caused by its negligence in making benefit determinations].)

---

7    A service provider's claim arises from the terms of the provider agreement and does not amount to claiming benefits under the terms of ERISA plans. (Cal. Practice Guide:  Insurance Litigation, *supra*, ch. 6E-H, ¶ 6:1274, p. 6E-92.)

As to Keenan individually, the negligent misrepresentation and agency allegations seem to rely on (1) Keenan's participation in designing the Plan's provisions, (2) the representations made by Aileen in response to Hospital's call to the phone number on the member identification card that Keenan supplied, and (3) its joint maintenance of the website with Anthem, also leading to some kind of agency between them.

Essentially, there are three types of misrepresentations alleged against all Defendants: (a) oral communications among Hospital personnel and Anthem personnel (b) which amounted to a course of dealing over approximately 50 days of such communications, designed to obtain medical necessity determinations necessary for treatment authorizations, and (c) generalized allegations of "trade custom and usage" in the industry. From some or all of those representations, Hospital alleges that an authorization of services constitutes an affirmative representation to it *by the agents* that, based on all of the information that *the Plan* was provided to date (and that it presumably provided to the agents), the requested services were covered by the Plan.

Specifically, Hospital alleges that the parties' execution of the network agreement gave rise to an agency relationship for Keenan and Anthem to jointly administer Eisenhower's Plan. Pursuant to the network agreement, Eisenhower provided its summary plan description to Anthem in order for it to perform "administrative services" (while Anthem also acted as an agent for Keenan). These "administrative services," performed by Anthem and Keenan on behalf of the Plan, are alleged to include "*all communications and direct dealings with providers*, such as the Hospital, including but not limited to *verification of eligibility, benefits and authorization of services*; negotiating

18

with providers, such as the Hospital, concerning any matters including the entering into and/or revisions to contracts; pricing claims in accordance with the terms of the plan documents and Summary Plan Description; producing member identification cards; conducting utilization review; *processing authorizations of services and responding to providers' request for such authorizations*; and coordination and management of medical care through case management."  (Italics added.)

The TAC alleges that the consequences of such a "trade custom and usage" are that, "to the extent that a health plan and its administrators have information indicating that services are not covered under the plan, the health plan and its administrators do not authorize such services."  Thus, "there has existed a trade custom and usage that *an authorization of services constitutes an affirmative representation that*, based on all of the information the health plan has been provided to date, *the services are covered*." (Italics added.)  The TAC further alleges that this "custom and usage is, and at all times mentioned has been, certain and uniform, of general continuity and notoriety, and acquiesced-in by the whole of this industry," and, beyond this, "was well known to the Hospital and to [Defendants] at the time of their communication of each of the authorizations."

The foundation of Hospital's intentional fraud claim is that Keenan and Anthem, as Eisenhower's agents, were allegedly in a position to know and did know of facts concerning the exclusion of coverage under the Plan for medical services received by Patient X, based on clinical information communicated to them by Hospital about his condition at admission (high blood alcohol level with cannabis found).  During the

process of obtaining authorizations for medical services provided to him, they falsely represented or implied that coverage would be supplied and Hospital would be paid, through (1) their continuing communications about privileged matter, including the clinical condition of Patient X, (2) their issuance of the medical necessity certification letters, and (3) trade custom and usage that the process would not be carried out unless coverage were available. Hospital describes the interactions between its own representatives and Aileen, unnamed care managers, Steele-Alvarez, Becerra, Myers, and others, about obtaining the medical necessity certification letters, as giving rise to its justifiable reliance on express and implied representations of the existence of coverage for Patient X.

Regarding damages, the TAC alleges that Hospital refrained from seeking reimbursement from Medi-Cal for services provided to Patient X within Medi-Cal's time limits or transferring him elsewhere, as a result of the delayed notification about the lack of coverage. Hospital thus alleges it was damaged through reasonable reliance on representations that Eisenhower would be paying Hospital for the services provided.

### B. Authority and Analysis

We are required to consider whether the broadly stated agency relationships claimed in the TAC support the intentional misrepresentation claims against Eisenhower (not Keenan). Eisenhower as the principal had the right to control the conduct of the agent on the subject of the agency, presumably including the types of representations to be made. (*Lewis v. Superior Court* (1994) 30 Cal.App.4th 1850, 1869 (*Lewis*).) An agent has the power to alter the legal relations between the principal and third persons, or

20

the principal and the agent. (*Id.* at pp. 1868-1869.) Even if an agent, at the time of the doing of an act, is without actual or ostensible authority, "the act may be rendered valid and binding on the principal, as of the time the unauthorized act was done, if the principal ratifies and thus gives effect to it." (3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment, § 139, p. 184; § 2307 ["An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification."].)

Here, both express and ostensible agency by Anthem and Keenan is alleged, in carrying out the administrative services for Eisenhower's Plan. " 'To establish ostensible authority in an agent, it must be shown the principal, intentionally or by want of ordinary care has caused or allowed a third person to believe the agent possesses such authority.' " (*Gulf Ins. Co. v. TIG Ins. Co.* (2001) 86 Cal.App.4th 422, 439 (*Gulf Ins. Co.*); § 2317 [how ostensible authority may be created, intentionally or negligently].) " '[W]here the principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct on the part of the principal' " may establish the existence of an agency relationship. (*Gulf Ins. Co., supra,* at p. 439.) A cause of action based on intentional fraud may arise from *conduct* that is designed to mislead, not only from verbal or written statements. (See *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1567 ["A misrepresentation need not be oral; it may be implied by conduct"]; *Universal By-Products, Inc. v. City of Modesto* (1974) 43 Cal.App.3d 145, 151 ["A misrepresentation need not be express but may be implied by or inferred from the circumstances."].)

21

Hospital has pled the existence of multiple written and oral communications from Anthem and Keenan, to Hospital, amounting to a course of conduct leading to certification of services as medically necessary, and under circumstances allowing Hospital to conclude that the agents were authorized to make representations about the existence of coverage for Patient X, the subject of the communications. Hospital alleges the dates, times, and names of the individuals who initiated these communications, which occurred over a period of approximately 50 days. In one conversation between Anthem discharge planner Steele-Alvarez and a Hospital representative, Steele-Alvarez, on behalf of Anthem, authorized and *requested* that Hospital admit Patient X to its acute rehabilitation facility upon his discharge from Hospital's ICU.

In support of these specialized claims of agency, Hospital contends that when Eisenhower provided to its agents certain private information regarding the patient's identity, Eisenhower represented to Hospital that the agents were authorized to participate as part of its process of obtaining authorizations and coverage determinations, because the agents would not otherwise be legally entitled to access private information, including the patient's clinical condition, if the services were not covered. On behalf of Eisenhower and themselves, the agents' faxed communications to Hospital are alleged to represent that under HIPAA,[8] the operator and agents of the Plan and the providers were allowed to disclose protected health information to each other for purposes of treatment, payment and health care operations, as long as there is a supportive coverage relationship.

---

[8] HIPAA is the Health Insurance Portability and Accountability Act of 1996, 110 Stat. 1936.

(§ 56.10 [disclosure of medical information without authorization is allowed to the extent necessary for determination of payment responsibility].)

In general, agency allegations plead the ultimate facts asserted about the parties' relationships. (*Skopp v. Weaver* (1976) 16 Cal.3d 432, 437; *City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 212.) At the pleadings stage, any factual questions about what particular inquiries were intended by the parties to be encompassed within the administrative services provided are beyond the scope of this opinion. These questions may include the extent of ostensible or actual authority, delegated from Eisenhower to Keenan or Anthem, to deal with providers on questions about the contents of the Plan, and may depend on how the questions were raised. (§ 2319 [scope of agent's authority].) Hospital appears to allege as ultimate facts that "claims administration" encompasses coverage questions and that the agents were held out to be experienced in these matters, not only on issuing medical necessity certification letters but also in making representations on coverage questions. Eisenhower claims that it did not participate in the delegated process, but the effect of the full text of the medical necessity certification letters and their disclaimers, and the extent of responsibility of the respective parties, appear to be factual matters not yet established and subject to proof. (*Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co.* (C.D. Cal. 2007) 520 F.Supp.2d 1184, 1194 (*Tenet Healthsystem Desert, Inc.)* [factual issues and expert testimony analyzed about the extent of industry custom and practice in authorizing treatment].)

Hospital provided sufficient information in the TAC to permit Eisenhower's agent Anthem, as a party with superior knowledge of who was responsible for preparing the

23

medical necessity certification letters, to identify its *unnamed* case managers who sent them. (See *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 793 [plaintiff was not required to plead the identity of the preparer of a letter from "the Chase Fulfillment Center" because that information "was uniquely within Chase Bank's knowledge"], see *Committee on Children's Television, supra,* 35 Cal.3d 197, 217 [less specificity is required in pleading fraud when " 'it appears from the nature of the allegations that *the defendant* must necessarily possess full information concerning the facts of the controversy,' " italics added]; *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248 [" 'While the precise identities of the employees responsible . . . are not specified in the loan instrument, defendants possess the superior knowledge of who was responsible for crafting these loan documents.' "].) The same is true as to which of the Defendants employed "Aileen A." or any other individual identified in the complaint, or which of the Defendants maintained each telephone number and fax number identified in the complaint. Defendants are presumably the ones who know which entity is responsible for the different tasks that are required to administer Eisenhower's health insurance plan.

Although the TAC is lengthy, diffuse, and confusing, Hospital has clearly enough pled facts about the different types of intentional representations claimed, to show how the statements were made (directly to agents of Hospital through telephone calls and written letters faxed to Hospital); when the statements were made (on the identified dates and the specified times); where the statements were made (at Hospital, where its representatives received the communications); to whom the statements were made (to

24

identified Hospital employees); and the means by which they were made (by way of telephone calls placed and letters faxed from numbers that are alleged to belong to Defendants). (See *Lazar*, *supra*, 12 Cal.4th at p. 645 [pleading with particularity necessitates pleading that " ' "show[s] how, when, where, to whom, and by what means the representations were tendered." ' "].)

Further, Hospital alleged the identities of certain individuals who acted as the agents of Anthem (and possibly Aileen on behalf of Keenan). Hospital alleged a basis for its belief that such individuals had the authority to act on Anthem's behalf, including the facts that these individuals were originally reached through Hospital's call to the number provided on Patient X's member identification card, and that these individuals possessed private health and identifying information about Patient X that they would not have had, absent their employment/agency relationship with Anthem and its principal, Eisenhower. They knew that he was admitted while having a high blood alcohol level, which potentially implicated his right to coverage under the Plan. (§ 1710, subd. (1) [defining tort of deceit as including the suggestion, as a fact, of that which is not true, by one who does not believe it to be true].) Based on the network agreement and the roles played by Eisenhower as a Plan operator, and Keenan and Anthem as claims administrators, these allegations are subject to appropriate inferences that the participants had particular expertise in the matters on which the representations were made. (*Fremont Indemnity Co.*, *supra*, 148 Cal.App.4th 97, 111 [on demurrer, court assumes truth of properly pleaded factual allegations and of reasonably inferable facts].)

25

The TAC alleges that knowledge of the Plan's coverage, including the exclusions, was, as between the parties, exclusively in Defendants' possession, and that Hospital informed Anthem and/or Keenan, through the number given it by Aileen, that Patient X was admitted to Hospital as a result of being injured while driving in an automobile accident with a blood alcohol level in excess of the legal limit and positive for cannabis. As a result, any representations Anthem made that indicated to Hospital that the services Hospital was providing to Patient X would be covered are alleged to have been made with the knowledge that those representations were false and would be binding on Eisenhower.

Moreover, Hospital sufficiently alleged that the representations were material to its decision to provide the services, in terms of its justifiable reliance and damages claim elements. (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th 951, 977 [representation is " 'material' " if a reasonable person " 'would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; [citations] . . . materiality is generally a question of fact unless the '[information] is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.' "].) Hospital pleads it "was ignorant of the falsity of the representations [made by Defendants], and believed them to be true," and that Hospital acted in reliance on the representations when it admitted Patient X to ICU and rehabilitation facilities.

We think the specific nature of these alleged communications, together with the allegation that the provision of an "authorization" has a specific meaning in this context

26

(i.e., that an "authorization of services constitutes an affirmative representation that . . . the services are covered"), means that Hospital has sufficiently alleged the existence of Eisenhower's multiple affirmative misrepresentations that the care that Hospital rendered to Patient X would be covered by the Plan. If the services were not covered, the agents would have not been entitled to continue to inquire about the patient's clinical condition. Hospital did not have to allege an express, affirmative statement on the existence of coverage, in light of the intentional course of conduct that is alleged.

Generally, the existence of an agency is treated as a factual question, unless the evidence is undisputed; then, "the issue becomes one of law." (3 Witkin, *supra*, Summary of Cal. Law, Agency & Employment, § 93, p. 141, citing *Magnecomp Corp. v. Athene Co*. (1989) 209 Cal.App.3d 526, 536; *Violette v. Shoup* (1993) 16 Cal.App.4th 611, 619.) At this pleadings stage of the case, no factual questions are being resolved, and we examine only whether the allegations set forth a cognizable claim. Hospital need not clarify all details of Defendants' relationships with each other, or each entity's particular role in conducting and administering the health insurance plan at issue, to enable Eisenhower to defend against the claims that Hospital asserts. (See *Committee On Children's Television*, *supra*, 35 Cal.3d at pp. 216-217.) Overall, the TAC provides an adequately detailed set of allegations of intentional fraud against Eisenhower.

# III

## *FRAUD:  SUPPRESSION OF FACTS (EISENHOWER, CAUSES OF ACTION NO. 2 (REHAB.) AND 11 (ICU)*

### A.  Nature of Allegations

These causes of action for damages for suppression or concealment of facts rely on the same underlying scenario alleged in the intentional fraud claim, regarding the existence of the network agreement, the member identification card, the website, and the trade custom and usage and course of dealing.  Hospital alleges that from its course of dealing with Eisenhower's agent Anthem, Hospital was led to believe that an authorization or certification of services constitutes an affirmative representation that the services will be covered.  Also, Hospital was provided by Eisenhower and Anthem with Patient X's private identity and medical information about his condition at admission (high blood alcohol level, cannabis), leading it to conclude that Anthem's representatives were agents of Eisenhower who were consequently authorized to make representations about the patient's benefits information, including any exclusions from coverage.

Hospital claims that during the ongoing communications about Patient X's clinical condition and the requests for medical necessity certification letters, Eisenhower and its agents were on notice, but failed to reveal, that no coverage would be forthcoming, and they suppressed those facts to mislead Hospital.   If those facts had not been suppressed, Hospital would have transferred Patient X to county facilities and sought Medi-Cal reimbursement for his care.  Because of the late notification of the exclusion from coverage, Hospital was unable to seek reimbursement from Medi-Cal.

28

## B. Authority and Analysis

For a tort claim of suppression or nondisclosure of known material facts, three varieties of such a claim against a nonfiduciary were identified in *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294: "(1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff." (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612–613 (*Marketing West*); § 1710, subd. (3) [deceit includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."].)

Thus, active concealment or suppression of facts by one having knowledge or belief of the significance of facts related to them may be fraudulent, and may be the equivalent of a false representation, i.e., a variety of actual fraud. (5 Witkin, Cal. Proc. (5th ed. 2008) Pleading, § 722, p. 138; § 1572, subd. (3) [suppression of fact].) (In comparison to this intentional tort claim based on a defendant's suppression of known material facts, a cause of action for negligent misrepresentation does not require such fraudulent intent; see pt. IV, *post*.)

A plaintiff can demonstrate fraudulent nondisclosure by a defendant if the facts that were withheld would have materially affected the value or desirability of the property or the transaction, and such facts were known to the defendant, who also knew

29

that the facts were "unknown to or beyond the reach of the plaintiff." (*La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131, 1151-1152.) To plead fraud and deceit based on concealment, the plaintiff must allege that the defendant concealed or suppressed a material fact in a situation in which the defendant was under a duty to disclose that material fact.

Although Hospital has not alleged the existence of a fiduciary or confidential relationship, the allegations otherwise specify facts supporting its claim that Eisenhower's agent Anthem made representations to Hospital, while failing to disclose other facts that rendered misleading the disclosures that were made. Hospital alleged that over a period of almost two months, representatives of Anthem repeatedly "authorized" the medical services that Hospital provided to Patient X, despite their presumed knowledge that his care would be excluded by the insurance policy, because his injuries were sustained as a result of his driving with a blood alcohol level in excess of the legal limit.

Even if Hospital had not alleged that by "authorizing" services, Defendants were also representing that the services would be "covered" or paid for by the Plan, Hospital sufficiently alleged that Anthem's statements to Hospital concerning the authorization of services and Anthem's requests for information, to which it would not be entitled if it the services were not covered by the Plan, were all made on behalf of Eisenhower and were misleading. Hospital can permissibly plead that since no significant facts were disclosed about the Plan's exclusion from coverage for Patient X's injuries, the nature and number of Anthem's communications with Hospital over approximately 50 days would otherwise

30

have caused a reasonable person to believe that the services would be paid for by the Plan.

In light of the specificity of these numerous alleged communications, together with the allegation that the provision of an "authorization" has a specific meaning in this context (that an "authorization of services constitutes an affirmative representation that . . . the services are covered"), Hospital has sufficiently alleged the existence of multiple affirmative misrepresentations by the agents, potentially binding Eisenhower, that Patient X's care would be covered by the Plan. The representations are pleaded in a context of the existence of other material facts that were not disclosed.

The merits of the case are not now before us, on whether the disclosures Defendants made were so incomplete and defective as to amount to actionable fraudulent nondisclosure. In a concealment case, the duty of disclosure is treated as "fact dependent and a question for the trier of fact, not a question of law." (*Marketing West, Inc.*, *supra*, 6 Cal.App.4th at p. 614; see *Charpentier v. Los Angeles Rams Football Co.* (1999) 75 Cal.App.4th 301, 312, fn. 9 [existence of duty to disclose was "for the jury to sort out"].) We decide only that Hospital has adequately pled facts supporting its theory that Eisenhower's agents, on its behalf, tortiously suppressed material facts in these transactions.

IV

*NEGLIGENT MISREPRESENTATION (BOTH EISENHOWER AND KEENAN; CAUSES OF ACTION NOS. 1 [REHAB.] AND 10 [ICU])*

A.  Nature of Required Allegations

In addition to alleging Eisenhower's intentional fraud and concealment, as above, the TAC also brings a cause of action for negligent misrepresentation damages against Eisenhower and its alleged agents, including Keenan.  Those allegations initially outline the status of Keenan and Anthem as authorized agents and administrators of Eisenhower's Plan, as well as pleading there is a trade custom and usage, and a course of dealing common throughout the industry, such that when authorizations of services are requested by a provider through a health plan's authorized agents, coverage is affirmatively represented to be available.

Hospital contends that although the various Keenan and/or Anthem employees were put on notice that Patient X was injured while having a high blood alcohol level and some cannabis level, they did not disclose the existence of any applicable exclusions, nor did the website they jointly maintained do so.  Hospital claims that while Defendants continued to make representations in the medical necessity certification letters, as part of the authorizations for services process, they had no reasonable ground for believing their representations were true or that the Plan would be financially responsible to pay for covered services.

Hospital alleges that it was ignorant of the falsity or incorrectness of the representations made by Defendants, but believed them to be true.  Hospital reasonably

32

believed that Defendants were complying with privacy laws regarding patient information, and further, Hospital was ignorant as to the terms of coverage under the Plan. Defendants allegedly knew that Hospital would rely on their statements made during those claims administration and utilization review services. Hospital acted in reasonable reliance on the representations and seeks damages to compensate it for those expenses.

## B. Authority and Analysis

Under sections 1709 and 1710, subdivision (2), the tort of deceit may include a party's "assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." In *Byrum v. Brand* (1990) 219 Cal.App.3d 926, 940-942, this court acknowledged that the statutory definitions of negligent misrepresentation normally require that such allegations of the element of a "representation" include that the defendant asserted or positively asserted a fact, rather than merely omitting to state something. There, we held an alleged misrepresentation by omission, of material facts about an investment, was insufficient to meet the statutory definitions, where the plaintiff could not show the defendant had positively asserted any facts about these topics that were not true, nor had the defendant actively concealed or suppressed any such facts that were known to him. (*Ibid.*) For pleading and proving negligent representation, it was not adequate for a plaintiff to argue that a defendant's failure to disclose any undiscovered facts, even assuming the defendant had a duty to investigate, would have amounted to a negligent omission. We reasoned, "There were apparently no known facts which [the

33

defendant] failed to disclose, from which nondisclosure could be inferred an implied representation that the facts were otherwise." (*Id*. at p. 942, italics omitted.)

Moreover, a negligent misrepresentation claim must set forth allegations that the facts that were not accurately presented were either past or present, existing material facts. " '[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud.' " (*Tarmann, supra*, 2 Cal.App.4th at p. 158.)

As already set forth in our discussion of the other fraud claims, we think that Hospital has sufficiently set forth specific facts to support its pleading of the preliminary elements of fraud (a set of affirmative representations of an existing set of facts on the equivalent of coverage availability, their falsity and the knowledge of falsity; pts. II, III, *ante*). Those facts include the circumstances under which the medical necessity certification letters were issued, including background about the medical identification card, the network agreement, the disclosures of private information about the patient, and the agency allegations. Hospital's allegations about the trade custom and usage and course of dealings common throughout the industry, for obtaining authorizations of services from a health plan's authorized agents, include its theory that the authorization process presumes that coverage is available under the plan they are administering, based on their access to privileged information and the overall purposes of utilization management. Taken together, those initial elements of this cause of action are alleged with enough specificity in the TAC.

For this negligent misrepresentation cause of action, it is not necessary to allege any fraudulent intent. This claim does not rely on an alleged false promise that was made with an intentionally deceptive state of mind, and it is thus distinguishable from Hospital's other fraud theories (e.g., a promise falsely made without any intention to perform it, § 1710, subd. (4) [pt. V.A, *post*]; *Tarmann, supra*, 2 Cal.App.4th at pp. 158-159). Thus, Hospital need not set forth allegations here that Defendants had a fraudulent intent to induce reliance, or they fraudulently concealed material information. (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173; *Gagne v. Bertran* (1954) 43 Cal.2d 481, 487-488.) Misrepresentations may be implied from conduct. (See *Thrifty-Tel, Inc. v. Bezenek*, *supra*, 46 Cal.App.4th at p. 1567.) In this claim of negligent misrepresentation, Hospital does not rely on allegations of intentionally misleading conduct, but it does claim that more than a negligent omission took place during the transactions. Its trade custom and usage allegations, as the equivalent of making affirmative representations about the availability of coverage in this context, will satisfy this pleading requirement. (*Byrum v. Brand*, *supra*, 219 Cal.App.3d 926, 940-942.)

However, Hospital as the plaintiff is still required to allege justifiable reliance on the erroneous or incomplete representations, as well as causation and damages. It is usually a question of fact whether a plaintiff's reliance was reasonable. (*Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 186.) Hospital is alleging that throughout the transactions, Eisenhower and Keenan, among others, did not accurately represent existing material facts about potential availability of coverage for Patient X, or about Eisenhower's potential liability for reimbursement of expenditures. In light of the

35

lengthiness of the communications on medical necessity, and the factual questions about what particular inquiries were encompassed within them, we cannot now determine, for pleadings purposes, that the statements made by Eisenhower's agents in sending the medical necessity certification letters were wholly neutral and not inferentially deceptive. (See *Diediker v. Peelle Financial Corp.* (1997) 60 Cal.App.4th 288, 297-298 [neutral statements do not support negligent misrepresentation claims]; *Fremont Indemnity Co.*, *supra*, 148 Cal.App.4th at p. 111 [on demurrer, court assumes truth of properly pleaded factual allegations and of reasonably inferable facts].)

Keenan argues its participation in providing the medical identification card and maintaining the website amounted to something less than making any positive assertions of the extent of coverage to be afforded or promises about compensation amounts. Keenan questions whether the trade custom and usage allegations suffice to plead the ultimate fact of agency or to give significance to the authorization representations.

We think Hospital has alleged sufficient facts to support its negligent representation claim that the representations made by Eisenhower and its agents, who were held out to be experienced in these matters, gave Hospital some basis for believing that the referrals and authorizations made for Patient X's treatment would be routine in nature, rather than subject to any specific exclusions from coverage. (See *Tenet Healthsystem Desert, Inc., supra*, 520 F.Supp.2d at p. 1194 [on factual issues and use of expert testimony about the extent of industry custom and practice in authorizing treatment].) Factual issues may remain about the extent of the duties imposed on each of the Defendants by the network agreement, and whether Hospital's reliance on the

36

communications was reasonable, but such factual issues cannot be resolved on demurrer. The trial court erred in sustaining the demurrer with respect to causes of action Nos. 1 and 10.

V

*CLAIMS VERSUS EISENHOWER ONLY*

A. Fraud:  Promise Made Without Any Intent to Perform
(Causes of Action Nos. 4 [Rehab.] and 13 [ICU])

*1. Allegations*

As with the other fraud-related causes of action, this claim relies on the same underlying sequence of events and agency allegations, as creating Eisenhower's "promise" that coverage was available for the authorized services, or alternatively that reimbursement would be made, but such promises were made without any intent to perform on them.  Specifically, Hospital alleges that it was made aware of the Plan's member identification card, the network agreement, the website, the trade custom/usage and course of dealing, but without any additional notification that applicable exclusions would be enforced.  Hospital claims it was led to believe that an authorization or certification of services constituted an affirmative representation by the Plan operator, Eisenhower, that the services would be covered.

Based on industry custom, Hospital claims against Eisenhower alone that when Defendants, as agents of Eisenhower, made available to it Patient X's private identification and medical information, including his condition at admission with a high blood alcohol level, Hospital was justified in concluding that those agents were

37

authorized to make representations about his benefits information, including the status of any applicable exclusions from coverage. During its ongoing communications about the patient's clinical condition and the requests for authorizations, Hospital claims that Eisenhower and its agents were on notice of, but failed to reveal, the effect of the reported blood alcohol level of Patient X at his admission upon coverage availability (ultimately none). Hospital alleges that Eisenhower promised to pay for the services provided, but because of Eisenhower's knowledge that Patient X would not be entitled to coverage under the Plan, this promise was made without any intention to perform it.

Hospital then alleges it reasonably relied on the promise in providing the services and was damaged thereby. If the promise had not been made, Hospital would have transferred Patient X to county facilities and sought Medi-Cal reimbursement for his care. Because of the late notification of the exclusion from coverage, Hospital was unable to seek reimbursement from Medi-Cal.

### 2. Authority and Analysis

In the contract context, section 1572, subdivisions (4) and (5), provide that actual fraud may consist of a party's intentionally deceptive acts, done as inducement to enter into a contract, such as making a promise "without any intention of performing it; or [committing] [a]ny other act fitted to deceive." (*Ibid*.) Such a " 'false promise is actionable on the theory that a promise implies an intention to perform, that *intention to perform or not to perform* is a state of mind, and that misrepresentation of such a state of mind is a misrepresentation of *fact*. The allegation of a *promise* (which implies a

38

representation of intention to perform) is the equivalent of the ordinary allegation of a representation of fact.' " (*Tarmann*, *supra*, 2 Cal.App.4th at pp. 158-159.)

This variety of claim is quite similar to the fraud claims found sufficient above (pts. II-IV, *ante*). Promissory fraud "is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.] . . . [¶] . . . [T]he plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract. 'If it is enforceable, the [plaintiff] . . . has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract.' [Citations.] Recovery, however, may be limited by the rule against double recovery of tort and contract compensatory damages." (*Lazar*, *supra*, 12 Cal.4th at p. 638; § 1710, subd. (4) [deceit may include a "promise, made without any intention of performing it"].)

Where a fraud or misrepresentation claim is predicated on a failure to perform contractual obligations, " 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.' " (*Tenzer v. Superscope*, *Inc.* (1985) 39 Cal.3d 18, 30; *Magpali v. Farmers Group, Inc*. (1996) 48 Cal.App.4th 471, 481.) Although Hospital had pled a lack of participation of Eisenhower itself in the process, it made significant agency allegations about the conduct of Eisenhower's codefendants, in continually approving requests for services as medically necessary. As described in the TAC, different tasks are required to administer Eisenhower's health insurance plan, and Eisenhower allegedly represented to Hospital that the agents were authorized to

participate in its process of obtaining authorizations and making coverage determinations. Hospital appears to allege as ultimate facts that "claims administration" encompasses coverage issues, that the agents were held out to be experienced in these matters, and that the issuance of medical necessity certification letters involves making representations about coverage questions.[9]

Eisenhower as a principal presumably retained the right to control the conduct of the agents on the subject of the agency. (Pt. II.B, *ante*; *Lewis, supra,* 30 Cal.App.4th 1850, 1869.) Both express and ostensible agency by Anthem and Keenan are alleged, in carrying out the administrative services for Eisenhower's Plan. (*Gulf Ins. Co., supra,* 86 Cal.App.4th 422, 439; § 2317 [how ostensible authority is created, intentionally or negligently].)

On agency issues, we find analogous the case of *Preis v. American Indemnity Co.* (1990) 220 Cal.App.3d 752 (*Preis*). There, a defense summary judgment for a property insurer (American) was reversed, based on the plaintiffs' contentions they relied on American's certificate of insurance that was issued by an insurance broker, Al Schlom, on its behalf and on behalf of American's subagent (Appleby). The court reiterated basic agency rules as follows:

> "Generally speaking, a person may do by agent any act which he might do himself. [Citations.] An agency is either actual or

---

9     As already observed, the allegations about Keenan individually relate to its participation in designing the Plan's provisions, including the website, and the representations made by Aileen in response to Hospital's call to the phone number on the member identification card that Keenan supplied. Hospital also alleges some kind of agency between Keenan and Anthem.

ostensible. [Citation.] 'An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him.' [Citation.] To establish ostensible authority in an agent, it must be shown the principal, intentionally or by want of ordinary care has caused or allowed a third person to believe the agent possesses such authority. [Citations.] [¶] Under Civil Code section 2334, a principal is bound by acts of his ostensible agent to those persons 'who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof.' Liability of the principal for the acts of an ostensible agent rests on the doctrine of 'estoppel,' the essential elements of which are representations made by the principal, justifiable reliance by a third party, and a change of position from such reliance resulting in injury." (*Preis*, *supra*, at p. 761.)

Where the principal "knows that the agent holds himself out as clothed with certain authority, and remains silent," the principal's conduct in allowing the agent to conduct business in that way may give rise to responsibility on the insurance documents. (*Preis, supra,* 220 Cal.App.3d at p. 761.) "Defendants have not negated the possibility their act of placing Schlom in such a position to amend the policy or their failure to exercise the requisite degree of control over the issuance of insurance documents on their behalf caused plaintiffs to believe Schlom possessed the power to act." (*Id.* at p. 763.) Accordingly, the court in *Preis* ruled that a triable issue of material fact existed as to whether American (the principal) or its subagent had negligently caused or allowed the plaintiffs to believe that the broker (Schlom) "possessed the authority to modify the insurance policy." (*Ibid.*)

We have declined to take judicial notice of the existence and context of the medical necessity certification letters, as Eisenhower requested. It would not be proper to consider the factual issues of interpretation of those letters in this demurrer proceeding,

41

and the issues about the extent of industry (trade) custom and practice, as pled, remain subject to proof. (*Tenet Healthsystem Desert, Inc., supra*, 520 F.Supp.2d 1184, 1193-1197 [expert testimony on industry custom was presented regarding standard practices of healthcare providers on processing claims or authorizations with or without medical information, on implied contract issues presented].) However, in pleadings analysis, the allegations about the network agreement and the roles played by Eisenhower (Plan operator or sponsor), and Keenan and Anthem (claims administrators), are subject to appropriate inferences that the participants had particular expertise in the matters on which the representations were made. (*Fremont Indemnity Co.*, *supra*, 148 Cal.App.4th at p. 111 [on demurrer, court assumes truth of properly pleaded factual allegations and of reasonably inferable facts].) It cannot now be determined how much responsibility Eisenhower delegated to Keenan or Anthem, to deal with providers on questions about the contents of the Plan. (§ 2319 [scope of agent's authority].)

Hospital alleges that Eisenhower, through its agents, may have made representations of fact concerning the scope of coverage of the policy, and argues it cannot now be determined whether Eisenhower thus qualifies as a promisor within the meaning of this theory, promise made without intent to perform. (*Tarmann*, *supra*, 2 Cal.App.4th at pp. 158-159.) When Patient X arrived at the hospital, Hospital employees made the telephone call to the number on his member identification card, thus requesting services on his behalf. Eisenhower's representations, made through its agents, were that he had a plan that provided medical coverage. There were no timely disclosures to Hospital (or to the patient) that coverage would eventually be precluded or excluded. For

42

purposes of demurrer analysis, we have been given no reason why the agency allegations may not equally apply to this variety of the fraud pleading, the fourth and 13th causes of action. The trial court erred in sustaining those demurrers without leave to amend.

## B. Promissory or Equitable Estoppel (Causes of Action Nos. 6-7 [Rehab.] and 15-16 [ICU])

### 1. Allegations

Hospital alternatively seeks relief on promissory estoppel or equitable estoppel theories. (*Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 674 [equitable or promissory estoppel may be presented as alternative theories of recovery].) First, regarding promissory estoppel to deny a contract existed, Hospital repeats its allegations about the member identification card, network agreement and trade custom and usage, all as giving rise to Hospital's understanding that an authorization of services constitutes an affirmative representation that the services will be covered. Since Hospital was provided by Defendants with Patient X's private identity and medical information about his condition at admission (high blood alcohol level, cannabis), it claims it reasonably concluded that Anthem's representatives were agents of Eisenhower who were consequently authorized to make representations about his benefits information, including the existence of any exclusions from coverage. Based on Eisenhower's agents' continuing communications, including private information about the patient's clinical condition and the requests for authorizations for treatment, Hospital relied on those representations in providing services, which was justified because Hospital reasonably believed that Eisenhower was complying with the law.

43

Next, Hospital alleges that if those representations had not been made, Hospital would not have admitted the patient or would have transferred him to county facilities and sought Medi-Cal reimbursement for his care. Because of the late notification of the exclusion from coverage, Hospital was unable to seek reimbursement from Medi-Cal.

Next, Hospital pleads it is entitled to relief on grounds of promissory estoppel by concealment, on the basis that Eisenhower and its agents provided information that was incomplete, about the member identification card and network agreement. Based on the course of dealing and trade custom and usage known to it, Hospital understood that an authorization of services constitutes an affirmative representation that, based on all of the information the health plan has been provided to date (and assuming that the agents were told), the services for the patient are covered. When Hospital disclosed clinical information to Eisenhower's actual and/or ostensible agents, Hospital received medical necessity certification letters that failed to identify that the Plan had any exclusion from coverage. Eisenhower knew or should have known that Hospital would rely on its incomplete representations, and if Hospital had known the actual facts, it would not have admitted the patient or continued to provide care to him, incurring damages.

As to each of the estoppel causes of action, Hospital concludes, "Injustice can be avoided only by enforcing the representations of Eisenhower [and Doe defendants] completely."

## 2. *Authority and Analysis*

"The elements of estoppel are: "(1) a representation of material fact by defendant, (2) with knowledge, actual or virtual, of the true facts, (3) to a party actually or

44

permissively ignorant of the truth, (4) with the intention, actual or virtual, that the other party act upon it, and (5) the other party was induced to act." (*Tenet Healthsystem Desert, Inc.*, *supra*, 520 F.Supp.2d 1184, 1195; *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 346 [unjust enrichment recovery is imposed on "a common law obligation implied by law based on the equities of a particular case and not on any contractual obligation"].)

"Promissory estoppel was developed to do rough justice when a party lacking contractual protection relied on another's promise to its detriment." (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 315 (*Kajima/Ray Wilson*).) Using equitable principles, this doctrine acknowledges that " 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " (*Id.* at p. 310; *US Ecology, Inc. v. State of California* (2001) 92 Cal.App.4th 113, 130.)

In *Cedars Sinai Medical Center v. Mid-West Nat. Life Ins. Co.* (C.D. Cal. 2000) 118 F.Supp.2d 1002, 1005 (*Cedars Sinai Medical Center*), the court analyzed a medical provider's lawsuit against an insurer and the holder of a group health care policy, seeking reimbursement of expenses of patient care it had provided. The insurer had "precertified" the provider's services for coverage, but the patient's health insurance coverage had been rescinded for misrepresentations he made during the application process. The court determined that the insurer's motion for summary judgment would be granted against the

45

provider's claims for breach of oral contract, fraud, and quantum meruit, but denied as to its negligent misrepresentation and estoppel claims. (*Id.* at pp. 1010-1015.)

In discussing estoppel in *Cedars Sinai Medical Center,* the court noted that its elements are "quite similar to that of negligent misrepresentation. The essential elements to support an estoppel claim are: (1) a representation of material fact by defendant, (2) with knowledge, actual or virtual, of the true facts, (3) to a party actually or permissively ignorant of the truth, (4) with the intention, actual or virtual, that the other party act upon it, and (5) the other party was induced to act." (*Cedars Sinai Medical Center*, *supra*, 118 F.Supp.2d at p. 1012; *San Diego Municipal Credit Union v. Smith* (1986) 176 Cal.App.3d 919, 923.) The court found there were triable issues of fact on whether the insurer, which had the ability to investigate before verifying coverage but failed to do so, was on notice of the potential lack of coverage, and on whether the provider had been induced to act and provide services upon the insurer's pre-certification on coverage availability. (*Cedars Sinai Medical Center*, *supra*, at p. 1012.) However, the court also determined that a preliminary "verification of coverage" was not a promise to pay for a patient's treatment, where neither party had manifested an intent to enter into a contract. (*Id.* at pp. 1008-1009.)

Here, Hospital as a provider is alleging only against Eisenhower, the Plan sponsor, that in these transactions, relevant, material information was not disclosed about the existence of any specific policy exclusions that might preclude a payment obligation. (*Regents of University of California v. Principal Financial Group* (N.D.Cal. 2006) 412 F.Supp.2d 1037, 1044 (*Regents of University of California*).) In that case, a hospital had

46

provided services to a patient injured while drunk driving, and the patient's insurer declined to pay for services on grounds of an exclusion for such patient conduct. When the hospital sued to recover its expenses, the insurer sought summary judgment. The motion was granted in part, disposing of the express contract and negligent misrepresentation claims. However, the court allowed the implied contract, estoppel, quantum meruit, and a statutory claim to proceed, "subject to renewal" upon further discovery into the relevant industry custom and practice about pre-authorization communications and authorizations for treatment. (*Id.* at pp. 1041-1047.) Those communications included disclaimers about the availability of benefits subject to plan provisions on eligibility, limitations or exclusions. (*Id.* at p. 1040.)[10]

Specifically, in allowing the estoppel claim to proceed, the court in *Regents of University of California*, *supra*, 412 F.Supp.2d 1037 reasoned, "It may be, in light of industry custom or past interactions with [insurer defendants], that [the provider] was not justified in expecting defendants to provide information about specific exclusions. Defendants have not presented any evidence of relevant industry custom and practice in connection with their motion." (*Id.* at p. 1046.) The denial of summary judgment in that case was made without prejudice to a renewed challenge to the estoppel and other claims, "if and when the parties produce sufficient evidence of industry custom to support a good

_____

10    In *Regents of University of California*, *supra*, 412 Fed. Supp.2nd 1037, 1047, the court was considering additional statutory claims brought under the Knox-Keene Health Service Plan Act of 1975. (Health & Saf. Code, § 1340 et seq.; § 1371.8.) That Act is not relied on in the TAC.

faith motion for summary judgment." (*Ibid.*; *Cedars Sinai*, *supra*, 118 F.Supp.2d at pp. 1012-1013 [factual issues remained on inducement and reliance].)

In our case, Hospital does not attempt to allege that Eisenhower, a Plan sponsor that delegated claims administration duties, made any direct promises to it about paying for services. Hospital does not deny that the Plan evidently contained exclusions applicable to Patient X, but contends that the manner in which Eisenhower's agents represented that they were authorized to administer an existing Plan gave rise to implied equitable obligations on the part of the principal, Eisenhower. It is unclear whether Eisenhower provided guidance or information to its agents about the scope of the coverage for the plan being administered. It cannot be determined at the pleading stage whether Eisenhower "virtual[ly]" knew of the significance of the policy exclusion, or whether the Hospital "permissibly" remained ignorant of the exclusion. (*Regents of University of California*, *supra*, 412 F.Supp.2d at p. 1045.)

The allegations of misrepresentations and concealments by Eisenhower's agents set forth facts from which Hospital can plead it was damaged due to the unavailability of coverage or reimbursement for services. Hospital provided uncompensated services, allegedly in detrimental reliance on those promises. (*Kajima/Ray Wilson, supra,* 23 Cal.4th 305, 315.) At the pleading stage, we determine only that it was error for the trial court to sustain the demurrers without leave to amend on these claims.

### C. Quantum Meruit; Common Counts for Services Rendered
### (Causes of Action Nos. 8-9 [Rehab.] and 17-18 [ICU])

#### *1. Allegations*

For the quantum meruit claims against Eisenhower and Doe defendants, Hospital simply alleges that it provided services to Patient X at the special request of Eisenhower, and that Eisenhower and/or the Doe defendants knew about the services and promised to pay their reasonable value, but have not done so.

On the common count claims, Hospital alleges that it provided services to Patient X, at the behest of and for the benefit of Eisenhower, and that Hospital's published charges reflect the reasonable and customary value for the services and supplies as provided. Based on allegations of the custom and practice in the health care industry, Hospital claims that Eisenhower expressly and/or impliedly promised to pay the amounts due at the rates published in professional fee schedules available to the public, even without a written contract. Other than the trade custom allegations, the activities by Anthem or Keenan, as Eisenhower's agents, are not expressly described.

#### *2. Authority and Analysis*

"The elements of a claim based on quantum meruit are: '(1) that the plaintiff performed certain services for the defendant, (2) their reasonable value, (3) that they were rendered at defendant's request, and (4) that they are unpaid.' " (*Tenet Healthsystem Desert, Inc.*, *supra*, 520 F.Supp.2d at p. 1196.) The issue is whether the plaintiff has an implied-in-law right to recover the reasonable value of services provided. (4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 566, p. 692; *Bell v. Blue Cross of California* (2005)

49

131 Cal.App.4th 211, 221.)  Quantum meruit compensation for a party's performance should be paid by the person whose request induced the performance.  (*Earhart v. William Low Co.* (1979) 25 Cal.3d 503, 515.)  It is not necessary that the inducing party be the same as the recipient of the benefit.  (See *Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 249; *Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 449-450.)

To plead a common count claim, the essential allegations are a statement of indebtedness in a certain sum, for what consideration, and nonpayment.  (4 Witkin, Cal. Procedure, *supra*, Pleading, § 557, pp. 685-686; *Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 460.)  In this context, it is sufficient to allege facts from which the law will imply a promise.  (4 Witkin, Cal. Procedure, *supra*, Pleading, § 559, p. 687.)

On these quantum meruit and common count claims, the TAC does not expressly incorporate the previous agency allegations about how Eisenhower delegated the administration of the Plan to Anthem and Keenan.  However, Hospital adequately pleads that it performed costly services at the inducement of Eisenhower, done according to the alleged custom and practice in the health care industry, which included implied promises about payment of amounts according to published professional fee schedules.  (*Earhart v. William Low Co., supra,* 25 Cal.3d at p. 515.)  In view of the above principles, the trial court erred as a matter of law in finding the quantum meruit and common count theories against Eisenhower lacked essential elements and were facially defective.

D.  Breach of Implied Contract (Causes of Action Nos. 5 [Rehab.] and 14 [ICU])

*1.  Allegations*

In support of its claim that implied-in-fact contracts arose between Hospital and Eisenhower, as well as the Doe defendants, Hospital alleges that its performance of services was voluntarily accepted by Eisenhower with the expectation that Eisenhower or the Doe defendants would compensate Hospital for them.  Eisenhower or the Doe defendants allegedly breached an implied contract by denying payments on claims made by Hospital, both for ICU and rehabilitation services.

Curiously, these causes of action for breach of implied-in-fact contracts do not incorporate the lengthy agency allegations from previous causes of actions, or set them forth separately.  Rather, the TAC only alleges in these instances that a trade custom and usage exists, that a health plan's authorization of services constitutes a promise to pay for such services and gives rise to an enforceable implied contract.

*2.  Authority and Analysis*

"California law requires four elements to form a valid contract:  1) parties capable of contracting; 2) their mutual consent; 3) a lawful object; and 4) sufficient consideration."  (*Tenet Healthsystem Desert, Inc.*, *supra*, 520 F.Supp.2d at p. 1193; §§ 1550, 1565.)  An implied contract is "one, the existence and terms of which are manifested by conduct."  (§ 1621; 4 Witkin, Cal. Procedure, *supra*, Pleading, § 526, p. 656.)

"The distinction between express and implied in fact contracts relates only to the manifestation of assent; both types are based upon the expressed or apparent intention of

51

the parties. 'The true implied contract, then, consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.' " (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 102, p. 144; italics omitted; *Silva v. Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 773; *Spinelli v. Tallcott* (1969) 272 Cal.App.2d 589, 595 [services of type usually charged for, and performed with defendant's knowledge].)

"Implied contracts, more accurately called contracts implied in fact, should be distinguished from contracts implied in law, or quasi-contracts." (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 103, p. 146; italics omitted; see *Desny v. Wilder* (1956) 46 Cal.2d 715, 737.) Hospital seeks to allege the ultimate fact of the making of Eisenhower's contracts to pay for the services rendered, through its theory of trade custom and usage, but without explaining how the services came to be authorized. It also cannot explain what terms would have been involved regarding payment for services rendered, full or partial. No conduct is alleged by the only named defendant here, Eisenhower, about its agreement to pay.

Whether a " 'verification of coverage was a promise' to pay for a patient's 'covered treatment, which resulted in a binding contract,' " appears to depend on factual issues about whether a party has manifested an intent to enter into such a contract. (*Tenet Healthsystem Desert, Inc., supra*, 520 F.Supp.2d at p. 1194.) In its reply brief, Hospital contends that its contract pleading should be broadly construed, in contrast to requiring specificity in stating a fraud claim. However, the breach of implied-in-fact contract

claims still lack the essential element of consent through Eisenhower's own conduct, and no information is pleaded here about Eisenhower's agents' activities on its behalf.

In *Regents of University of California*, *supra*, 412 F.Supp.2d 1037, the court granted the insurer defendants' summary judgment motion, dismissing the medical provider's express contract and negligent misrepresentation claims, on similar facts (albeit where the insurer defendant had evidently conducted its own business, rather than delegating it to agents). The court observed: "Hospitals such as UCSF, like insurers, are repeat players in insurance-related disputes and are likely aware of common policy exclusions." (*Id*. at p. 1044.) The court ruled that the plaintiff provider had failed to produce evidence supporting its theory that the insurer's written authorizations for treatment resulted in an express contract. However, the court permitted the provider's alleged implied contract theory to proceed, as follows:

> "It is not possible to discern the contours of plaintiff's implied contract claim from the complaint or moving papers. Presumably, plaintiff is claiming that defendants' conduct—authorizing treatment and allowing treatment to proceed without objection—manifested an unstated intent to be bound. *If so, the implied contract came into being after treatment was completed and after defendants failed to object, which occurred subsequent to the transmission of the authorization letters.* The acts giving rise to plaintiff's implied contract claim, although they may include the authorizations, are therefore at least partially distinct from the acts giving rise to the express contract." (*Regents of University of California*, *supra*, at pp. 1043-1044; italics added.)

The court accordingly determined that summary judgment could not then be granted in favor of the insurer on the implied contract theory, although further inquiry

53

into industry custom and practice might permit renewal of the motion. (*Regents of University of California, supra*, 412 F.Supp.2d at p. 1044.)

In our case, Hospital's implied contract theory against Eisenhower is based on trade custom and usage allegations, allegedly amounting to an implied promise by Eisenhower to pay for the services. Without incorporated or express agency allegations about Eisenhower's agents' activities, it is difficult to find any support for Hospital's theory that Eisenhower itself manifested an intent to enter into such a contract, or what its terms would be. (*Tenet Healthsystem Desert, Inc.*, *supra*, 520 F.Supp.2d at pp. 1194-1195.)

Whether or not the alleged implied contract *"came into being after treatment was completed and after [Eisenhower] failed to object"* (*Regents of University of California*, *supra*, 412 F.Supp.2d at pp. 1043-1044; italics added), or earlier, when the authorizations were granted by the other Defendants, there is still not any conduct or activity by Eisenhower alleged, other than permitting Patient X's enrollment in the Plan. We think that Hospital's extremely broad arguments on appeal about its implied-in-fact contract theory against Eisenhower are not supported by the cause of action as pled or the remainder of the TAC. The contractual arrangements outlined in the TAC do not support a conclusion that Eisenhower intended to expand coverage it had agreed to make available under the Plan, or to create exceptions to its exclusions, through its own conduct. Also, Hospital did not adequately plead that Eisenhower's agents were granted the authority to negotiate on contractual issues as part of their claims administration. The

54

trial court correctly sustained the demurrers to the fifth and 14th causes of action without leave to amend on this ground.

VI

*UCL CLAIM (BOTH EISENHOWER & KEENAN, CAUSE OF ACTION NO. 19)*

An unfair business practice includes " ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383.) A UCL challenge must allege that members of the public are likely to be deceived by the subject business act or practice, which is claimed to be unlawful, unfair, or fraudulent. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311-312; Bus. & Prof. Code, § 17200.) Hospital's claim of unfair business practices is based on a variety of alleged conduct, including that Eisenhower and Keenan "engaged in misrepresentation [and] fraud" in their business practices with Hospital, in the form of the conduct that underlies the deceit-based causes of action. Allegedly, Defendants' failure to fully inform Hospital of the existence of the applicable exclusions prevented Hospital from timely seeking alternative care or sources of payment, and restitution or injunctive relief is requested.

For the reasons set forth above in determining that the demurrers to the majority of the causes of action against Eisenhower were not properly sustained, and regarding the negligent misrepresentation claims as to both Eisenhower and Keenan, we likewise conclude that this derivative UCL cause of action has been adequately pled. Although we conclude the TAC sufficiently states facts in those respects, "this conclusion means only that [Hospital] has plead sufficient facts to overcome a demurrer. [Hospital] will

55

still be required to prove its claims, and we offer no opinion as to the likelihood that [Hospital] will be able to do so." (*US Ecology, Inc. v. State of California, supra,* 92 Cal.App.4th 113, 137.)  We reverse the judgment of dismissal with directions to overrule the demurrers as to all causes of action, with the exception that dismissal of numbers 5 and 14 is proper (breach of implied-in-fact contract as to Eisenhower).

## DISPOSITION

The judgment of dismissal is reversed with directions to overrule the demurrers as to all causes of action, with the exception that dismissal of numbers 5 and 14 is proper (breach of implied-in-fact contract as to Eisenhower).  The trial court shall otherwise allow the TAC to be reinstated for appropriate further proceedings.  Costs are awarded to Hospital.


HUFFMAN, Acting P. J.

WE CONCUR:


AARON, J.


PRAGER, J.*

---

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.